# In the United States Court of Federal Claims

No. 25-1140
(Filed:  18 December 2025)*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| BRASFIELD & GORRIE, LLC, | * |
|  | * |
| Plaintiff, | * |
|  | * |
| v. | * |
|  | * |
| THE UNITED STATES, | * |
|  | * |
| Defendant. | * |
|  | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Dirk Haire*, of Burr & Forman LLP, with whom were *Jessica Haire*, *P. Sean Milani-nia*, *Joseph L. Cohen*, *Michael W. Rich*, *David Timm*, *Chase E. Bullock*, and *Michael J. Brewer*, all of Washington, DC, for plaintiff.

*William P. Rayel*, Senior Trial Counsel, Commercial Litigation Branch, with whom were *Matthew D. Lewis*, Trial Attorney, *Douglas K. Mickle*, Acting Deputy Director, *Patricia M. McCarthy*, Director, *Brett A. Shumate*, Assistant Attorney General, Civil Division, Department of Justice, and *Tarrah M. Beavin*, Assistant Division Counsel, South Atlantic Division, United States Army Corps of Engineers, all of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

*It's just one pitch after another in the grand ballpark of federal procurement.*[1]  After this Court called seven pitches earlier this year, plaintiff Brasfield & Gorrie, LLC, is now up to bat to

---

\* This Opinion was originally filed under seal on 16 December 2025 pursuant to the protective order in this case. The Court provided the parties an opportunity to review this Opinion for proprietary, confidential, or other protected information and submit proposed redactions by 18 December 2025 at 5:00 p.m.  The Court accepts the parties' proposed redactions and reissues the Opinion with redactions as follows:  "[XXXXX]."

[1] *See* 17 April 2025 Oral Arg. Tr. at 107:9–108:10, *MVL USA, Inc. v. United States*, No. 24-1057, ECF No. 119; *MVL USA, Inc. v. United States*, 176 Fed. Cl. 582, 582 (2025).  Last year, seven plaintiffs filed a bid protest challenging the inclusion of PLA requirements in various government procurements.  In January, this Court held the PLA requirements in those procurements frustrated full and open competition—in contravention of the Competition in Contracting Act—because the PLA requirements improperly excluded responsible offerors and ignored market research.  In February, those plaintiffs moved this Court to permanently enjoin the Executive Order, asserting at oral argument the province of this Court is "to call[] balls and strikes on the other two branches and forc[e them] to come to a proper resolution of the law-making power and the implementation of the law-making power as [it] exists in the

swing at a procurement. On the pitching mound, the Army Corps of Engineers delivers another solicitation requiring a project labor agreement, and plaintiff protests it falls outside the Competition in Contracting Act's permissible strike zone. As the Court told the players in the last inning, the Court's role is to decide whether the present pitch adheres to the strike zone of legal authority and judicial review—not to change the rules of the game. Upon review, because the Court agrees with plaintiff this *particular* pitch is improper, the Court grants in part and denies in part plaintiff's Motion for Judgment on the Administrative Record. Considering it cannot call future pitches or change the rules of the game, the Court grants in part and denies in part the government's Cross-Motion for Judgment on the Administrative Record.

## I.    Factual Background

This case concerns the United States Army Corps of Engineers' ("USACE") amendment to solicitation WSLP-114 to require a Project Labor Agreement ("PLA") pursuant to Executive Order ("EO") 14063. The Court begins with a brief overview of EO 14063, subsequent federal procurement regulations implementing the EO, and relevant litigation and court decisions defining the proper scope of the EO's PLA mandate. The Court then summarizes the events relevant to plaintiff's protest of the PLA requirement.

### A.    Executive Order Instituting Project Labor Agreement Requirements

This Court has considered Executive Order 14063 and the legality of PLA requirements before. *See generally MVL USA, Inc. v. United States*, No. 24-1057, 174 Fed. Cl. 437 (2025) ("*MVL I*"); *MVL USA, Inc. v. United States*, No. 24-1057, 176 Fed. Cl. 582 (2025) ("*MVL II*"). *MVL I* outlines the basic background of EO 14063 and PLAs:

> In 2022, President Biden issued EO 14063, Use of PLA for Federal Construction Projects. *See* EO No. 14063, 87 Fed. Reg. 7363 (Feb. 9, 2022). President Biden based the EO in "the Constitution and the laws of the United States of America, including [the Federal Property and Administrative Services Act" ("FPASA") "to promote economy and efficiency in the administration and completion of Federal construction projects . . . ." *See id.* The EO mandated agencies to include PLAs with "one or more appropriate labor organizations" in "large-scale" government construction projects exceeding $35 million. *See id.* at 7363–64. The EO mandated PLAs because they "are often effective in preventing . . . problems from developing" and "provide structure and stability to large-scale construction projects." *See id.* at 7363. Specifically, the EO stated PLAs should be mandated to "avoid labor-related disruptions on projects by using dispute-resolution processes to resolve worksite disputes and by prohibiting work stoppages, including strikes and lockouts." *Id.*

---

Executive Branch." 17 April 2025 Oral Arg. Tr. at 108:1–4. In a May order denying plaintiffs' permanent injunction, this Court corrected plaintiffs' baseball analogy, noting it does have jurisdiction to call balls and strikes regarding individual procurements, but does *not* have jurisdiction to change the rules of the game through enjoining an executive order. Given the instant action involves the same interplay between Executive Order 14063, PLA requirements, and the Competition in Contracting Act, *inter alia*—and asks the Court to facially invalidate the Executive Order—the Court continues the "balls-and-strikes" analogy from its May order.

The EO, despite mandating PLAs for all government construction projects over $35 million, provided for narrow exceptions to the PLA requirement under certain circumstances. *See id*. at 7364. Particularly, the EO instructed a "senior official within an agency may grant an exception from the [PLA] requirement . . . for a particular contract by, no later than the solicitation date" if the senior official provides "a specific written explanation of why at least one of the following circumstances exists" regarding the contract: (1) "[r]equiring a [PLA] on the project would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement[;]" (2) "[b]ased on an inclusive market analysis, requiring a [PLA] on the project would substantially reduce the number of potential bidders so as to frustrate full and open competition;" and (3) "[r]equiring a [PLA] on the project would otherwise be inconsistent with statutes, regulations, [EOs], or Presidential Memoranda." *See id*. The "economy and efficiency" exception must be based upon the following factors:

> (i) [t]he project is of short duration and lacks operational complexity; (ii) [t]he project will involve only one craft or trade; (iii) [t]he project will involve specialized construction work that is available from only a limited number of contractors or subcontractors; (iv) [t]he agency's need for the project is of such an unusual and compelling urgency that a [PLA] would be impracticable; or (v) [t]he project implicates other similar factors deemed appropriate in regulations or guidance issued pursuant to section 8 of [EO 14063].

*Id*. Section 8 of the EO required the FAR Council to propose regulations implementing the order within 120 days, evaluate comments, and promptly issue a final rule. *See id*. at 7365. On 22 December 2023, the FAR Council promulgated a final rule implementing EO 14063, mandating "every contractor and subcontractor engaged in construction on the project agree, for that project, to negotiate or become a party to a PLA with one or more labor organizations." *See* Use of PLAs for Federal Construction Projects, 88 Fed. Reg. 88708, 88723 (Dec. 22, 2024) (incorporated in FAR pts. 1, 7, 22, 36, and 52); *see also* FAR 52.222-33 (Notice of Requirement for PLA); FAR 52.222-34 (PLA).

## B.    The *MVL I* Decision

*MVL I* concerned "[t]welve large construction companies . . . challeng[ing] the legal authority of federal agencies to mandate prospective contractors to enter project labor agreements with unions for consideration in federal construction projects exceeding $35 million." *MVL I*, 174 Fed. Cl. at 441. This Court held multiple agencies, in implementing EO 14063 to require PLAs, acted arbitrarily and capriciously and violated the Competition in Contracting Act ("CICA"), 41 U.S.C. § 3301, which requires "full and open competition" in government procurement. *See id.* at 470 (citing *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 982 (Fed. Cir. 2019) ("*NGS*"). This Court found, "under the PLA mandate . . . 'a

responsible offeror that declines to enter a PLA [was] not given the same opportunity to win an award as other offerors that submitted awardable proposals.'" *See id.* (quoting *NGS*, 923 F.3d at 985) (cleaned up).  For example, regarding an USACE solicitation, this Court found "USACE's decision to require a PLA, relying solely on the President's 'policy judgment' as implemented by the [Federal Acquisition Regulatory] Council, rather than actual market survey data supporting USACE's prior determination to not include a PLA [was] arbitrary and capricious." *See id.* at 466.  This Court held "the PLA mandate 'precludes full and open competition by effectively excluding [a non-PLA] offeror from winning an award'—both in the function of the mandatory rule itself and in the apparent policy to deny exceptions even when the agency itself commissions data indicating an exception should be made." *Id.* at 470 (citing *NGS*, 923 F.3d at 990).

C.     **The Aftermath of *MVL I***

After the *MVL I* decision, General Services Administration ("GSA"), Naval Facilities Engineering Systems Command ("NAVFAC"), and USACE removed PLA requirements from some of the solicitations at issue and cancelled the rest.  *MVL II*, 176 Fed. Cl. at 613.  Beyond the solicitation-specific relief in *MVL I*, however, executive agencies then began directing contracting officers to remove PLA requirements from other solicitations covered by EO 14063.

1.     **DoD and GSA Direct Contracting Officers Not to Require PLAs**

On 7 February 2025, the Department of Defense ("DoD") issued a memo instructing DoD contracting officers not to include PLA requirements in solicitations for large scale construction projects.  *See* DoD, Class Deviation 2025-O0002, *Waiver of Project Labor Agreement Requirements* (Feb. 7, 2025).  GSA followed suit five days later with a memo issuing a class exception to requiring PLAs for land ports of entry.  GSA, Memo SPE-2025-05, *Class Exception to Requiring a Project Labor Agreement for Land Ports of Entry* (Feb. 12, 2025).  Then, on 23 April 2025, DoD published a memo superseding its 7 February 2025 memo and mandating the removal of PLA requirements not only for large scale construction projects, but for all projects.  *See* DoD, Revision 1, Class Deviation 2025-O0002, *Waiver of Project Labor Agreement Requirements* (Apr. 23, 2025).

2.     **DC District Court Action Requires DoD and GSA Reinstate PLA Requirements**

After the DoD and GSA memos ended PLA requirements, three million workers and hundreds of trade unions sued, arguing DoD and GSA's actions violated the Administrative Procedure Act ("APA") because EO 14063 was legally promulgated and remained in effect.  *N. Am.'s Bldg. Trades Unions v. Dep't of Def.* ("*NABTU*"), 783 F. Supp. 3d 290, 299–300 (D.D.C. 2025).  The district court agreed, setting aside the agencies' memos and effectively reinstating the PLA requirement for solicitations for large-scale construction projects.  *See id.* at 315.  On 29 May 2025, GSA reinstated its PLA requirement for large-scale constructions projects, and DoD followed suit on 2 June 2025.  *See* GSA, Memo SPE-2025-13, *Rescission of SPE-2025-05, Class Exception to Requiring a Project Labor Agreement for Land Ports of Entry* (May 29, 2025); DoD, Rescission, Class Deviation 2025-O0002, *Waiver of Project Labor Agreement*

*Requirements* (June 2, 2005).  The Office of Management and Budget ("OMB") issued a memorandum on 12 June 2025 directing the heads of executive agencies to "use PLAs when practicable and cost-effective . . . [and] rescind any deviations related to PLAs that were issued prior to the date of this guidance."  OMB, Memo M-25-29, *Use of Project Labor Agreements on Federal Construction Projects – Amendments to OMB Memorandum M-24-06* (June 12, 2025) ("OMB Memo M-25-29").  The memo noted the Trump Administration "supports the use of PLAs when those agreements are practicable and cost effective."  *Id.* at 1.

### 3.    The *MVL II* Decision

After *MVL I*, several of the plaintiffs were not satisfied with solicitation-specific relief.  Consolidated plaintiffs, MVL USA, Inc., Environmental Chemical Corporation, Harper Construction Company, Inc., and JCCBG2, asked this Court to permanently enjoin the government from mandating PLAs in large-scale construction solicitations.  *MVL II*, 176 Fed. Cl. at 592–93.  This Court held the case was moot, given all solicitations at issue had already been canceled or amended, but in the alternative, analyzed whether it had jurisdiction to permanently enjoin an Executive Branch regulation.  *Id.* at 614–20.  Noting the Tucker Act limits the Court of Federal Claims' bid protest jurisdiction to protests "'by an interested party . . . in connection with a procurement or a proposed procurement,'" this Court held it lacked jurisdiction to permanently enjoin PLA requirements for unrelated procurements pursuant to EO 14063.  *Id.* at 616 (quoting 28 U.S.C. § 1491(b)(1)) (emphasis omitted).  This Court concluded:  "Exceeding the Court's statutory authority to address matters beyond the specific 'violation of statute in connection with these procurements' and these 'interested parties' is not merely calling a pitch—it is rather stepping out from behind home plate and changing the rules of the game—which is egregiously beyond the Court's statutory purview."  *Id.* at 617 (cleaned up) (quoting 28 U.S.C. § 1491(b)(1)).

### 4.    The *ABC* Decision, Appeal, and the Eleventh Circuit's Request for Supplemental Briefing

In March 2025, a group of construction companies (including B&G) sued the government in the District Court for the Middle District of Florida, seeking a nationwide preliminary injunction on the PLA requirement for large-scale construction projects.  *See Associated Builders and Contractors Fla. First Coast Chap. v. General Servs. Admin.*, No. 24-318 (M.D. Fla. Mar. 28, 2025).  The district court held plaintiffs failed to establish irreparable harm and denied injunctive relief.  *Id.* at 5, 9–12, 17–18.  Plaintiffs appealed.  *See* Pls.' Notice of Appeal, *id.*, ECF No. 59.  The Court of Appeals for the Eleventh Circuit, after oral argument, ordered supplemental briefing to address whether the Court of Federal Claims has exclusive jurisdiction to enjoin the PLA mandate under the Tucker Act.  *See* 19 September 2025 Order, *Associated Builders and Contractors Fla. First Coast Chap. v. General Servs. Admin.*, No. 25-11375 ("*ABC*"), ECF No. 38.  Both parties responded the Court of Federal Claims lacks jurisdiction to enjoin the PLA mandate beyond the scope of a specific procurement.  *See* Appellants' Supp. Br., at 6, *ABC*, No. 25-11375, ECF No. 42 ("As most recently held by the Federal Circuit, *en banc*, Section 1491(b) of the Tucker Act only applies to 'bid protests' regarding specific 'procurements or proposed procurements.'" (citations omitted)); Appellees' Supp. Br., at 2, *ABC*, No. 25-11375, ECF No. 43 ("[T]he Court of Federal Claims does not have authority to grant facial relief against the enforcement of procurement directives or regulations.  The Court of Federal Claims can grant

only as-applied relief from the terms of particular solicitations that it concludes are invalid."). A decision at the Eleventh Circuit is still pending. *See generally ABC*, No. 25-11375.

### D.    B&G's Protest

On 26 February 2025, USACE issued solicitation WSLP-114 for construction of a pump station to mitigate hurricane and storm damage station for West Shore Lake Pontchartrain, Louisiana. Admin. R. ("AR") Tab 28 at 3657 (Initial Solicitation). Neither the initial solicitation in February 2025 nor a November 2022 draft solicitation included a PLA requirement. *See* 19 Nov. 2025 Oral Arg. Tr. ("Tr.") at 9:23–25 ("THE COURT:  Did the November 2022 draft solicitation include a PLA requirement?  [THE GOVERNMENT]: No."), 24:6–8 ("[THE GOVERNMENT:]  [A] PLA requirement was not included in the initial solicitation in February 2025."). According to the government, USACE conducted a sources sought survey in June 2024 and, based on the responses, decided to add a PLA requirement to WSLP-114 as early as October 2024. *See* Tr. at 14:1–15 ("[THE GOVERNMENT:]  [T]he decision to include a PLA in the solicitation wasn't made until I believe it was October of 2024, but June of 2024 was when the [sources sought notice was issued].").

In relevant part, USACE's June 2024 Sources Sought Notice asked respondents:  "Can you meet the project labor agreement (PLA) requirements for projects over \$35M?" and "If this requirement was to be solicited on SAM.GOV, would you respond with a bid?"  *See* AR Tab 10 at 3540 (Sources Sought Notice for Reserve Relief Canal and I-55 Pump Station Project, dated June 7, 2024).  Nine construction companies responded.  *See* AR Tab 21 at 3605 (Memorandum Regarding Applicability of the PLA Exceptions, dated October 31, 2024).  Five responded "yes" to both questions.  *See id.*  A sixth, XXXXXXXXXXXXXXXXXXXXXXXX, responded "yes" to both questions, but expressed reservations about the details of a PLA requirement, noting, "[w]e do not hold the view that a government mandated project PLA would achieve any measurable positive economy or efficiency."  *See* AR Tab 14 at 3563 (XXXXXXXXXXXXXXXX Response to Sources Sought Notice, submitted June 14, 2024).  XXXXXXXXXXXXXXXXXXXX responded it would bid on the project, but that it "will not participate in a PLA project."  *See* AR Tab 13 at 3558, 3561 (XXXXXXXXXXXXX Response to Sources Sought Notice, submitted June 13, 2024).  XXXX included a two-page response to the PLA question, arguing "PLA requirements would significantly undermine federal interests in efficient and economical procurement by exacerbating area and national workforce shortages."  *See id.* at 3558–60.  The final two respondents indicated they would not meet PLA requirements, but their responses also indicated they would not be able to meet the bonding capacity requirements of the solicitation. *See generally* AR Tab 20 at 3601–02 (Market Research Report, signed October 28-30, 2024). The responses to USACE's Sources Sought Notice comprise the entirety of USACE's market research for a PLA requirement for WSLP-114—USACE's market research section of its Determination for Use of Project Labor Agreement (PLA) states in full:

> **Market Research.**  A sources sought was advertised on 7 June 2024 requesting sources specific to WSLP-114.  Nine (9) responses were responded to the sources sought synopsis, five (5) of which provided an affirmative response on the ability to meet the PLA requirement.  Sufficient competition is anticipated for the Government to obtain a fair and reasonable price for the requirement.  (Exception:

Based on an inclusive market analysis, requiring a project labor agreement on the project would substantially reduce the number of potential bidders so as to frustrate full and open competition.)

AR Tab 21 at 3605 (Memorandum Regarding Applicability of the PLA Exceptions, dated October 31, 2024).

Despite USACE's determination the market research supported a PLA requirement, the initial solicitation did not include a PLA requirement because DoD had issued a FAR class deviation that same month directing contracting officers not to require PLAs. *See* Tr. at 23:6–9 ("The only reason . . . the actual initial solicitation didn't include a PLA requirement was because of the FAR deviation precluding it."); *see also* Dep't of Def., Class Deviation 2025-O0002, *Waiver of Project Labor Agreement Requirements* (Feb. 7, 2005) ("Effective immediately, contracting officers shall not use project labor agreements for large-scale construction projects, implemented at Federal Acquisition Regulation (FAR) subpart 22.5 and 36.104(c)."). In June 2025, three days after DoD rescinded the FAR class deviation, USACE amended WSLP-114 to require a PLA. *See* AR Tab 41 at 7686 (Amendment 0005 to Solicitation, dated June 5, 2025) ("The Department of Defense has rescinded Class Deviation 2025-O0002 and it's Revision 1, Waiver of Project Labor Agreement Requirements in FAR 22.5. Therefore, Project Labor Agreements (PLAs) are hereby included in this solicitation per Executive Order 14063.").

### E.    Procedural History

On 7 July 2025, B&G filed a Complaint against the United States and USACE challenging the PLA requirement facially and as-applied to the WSLP-114 solicitation. Compl. ¶ 1. On 8 September 2025, plaintiff filed a Motion for Judgment on the Administrative Record. Pl.'s Mot. for Judgment on the AR ("Pl.'s MJAR"), ECF No. 16. On 17 September 2025, the government filed its Response and Cross Motion for Judgment on the Administrative Record. Gov't Cross-Mot. for Judgment on the AR ("Gov't Cross-MJAR"), ECF No. 18. B&G responded on 24 September 2025, and the government replied on 1 October 2025. *See* Pl.'s Resp., ECF No. 20; Gov't Reply, ECF No. 22. The Court held oral argument on 19 November 2025. *See* 17 November 2025 Order Setting Oral Argument, ECF No. 27.

In tandem with this litigation, eleven construction company plaintiffs have filed sixteen directly related bid protests challenging PLA requirements—all are consolidated under the case caption, *EVCON-CWC JV, LLC v. United States* ("*EVCON*"). *See* 2 July 2025 Order Consolidating Cases, *EVCON*, No. 25-1101, ECF No. 8; 27 August 2025 Order Consolidating Cases, *EVCON*, No. 25-1101, ECF No. 12; 26 September 2025 Order Consolidating Cases, *EVCON*, No. 25-1101, ECF No. 17; 18 November 2025 Order Consolidating Cases, *EVCON*, No. 25-1101, ECF No. 24. In its 27 August 2025 Order, this Court noted, "based on representations from counsel for the government and [USACE]," B&G's case "concerns an urgent procurement with a strict terminus of 15 December 2025." *See* 27 August 2025 Order Consolidating Cases at 2, *EVCON*, No. 25-1101. Accordingly, this Court set an expedited schedule and stated its intent to resolve B&G's protest before the expiration of a voluntary stay on 15 December. *See id.* On agreement of all parties, this Court consolidated the remainder of

the pending protests and stayed the consolidated action pending the outcome of B&G's protest. *See* 18 November 2025 Order Consolidating Cases, *EVCON*, No. 25-1101, at 3.

## II.    Parties' MJAR Arguments

Plaintiff argues USACE's addition of a PLA requirement to WSLP-114 violates CICA because the PLA requirement excludes responsible sources, including plaintiff, despite CICA's requirement all responsible sources be permitted to compete. *See* Pl.'s MJAR at 24. According to plaintiff, "B&G is a responsible source, is eligible to submit a bid, and must be given an equal chance to receive this contract as other responsible and eligible bidders." *Id.* (citations omitted). Plaintiff argues the inclusion of a PLA requirement was arbitrary and capricious because USACE's market research showed a PLA requirement would exclude bidders. *See id.* at 25–26. Plaintiff therefore requests the Court grant plaintiff's MJAR, "issue a declaratory judgement that the Agency's inclusion of the PLA Requirements in the Solicitation is a statutorily unauthorized restriction on competition in violation of CICA that is unlawful, arbitrary, capricious, or otherwise an abuse of discretion," and "issue a permanent injunction and order that the Agency remove and/or void the PLA Requirements from the Solicitation." *See id.* at 39.

In addition to its as-applied challenge, plaintiff challenges EO 14063 as facially invalid, noting apparent inconsistency between EO 14063 and both CICA and FPASA. *See id.* at 19, 26–32, 39. Plaintiff maintains this Court has jurisdiction to hear a facial challenge because its claims do not strictly challenge an agency's promulgation of a regulation (for which jurisdiction to overrule is limited to a United States District Court under the APA) but instead stem from USACE's application of the regulations to this specific procurement in violation of CICA. *See* Pl.'s Resp. at 14–15. Paralleling the relief sought for its as-applied challenge, plaintiff requests the Court "issue a declaratory judgement that FPASA does not authorize the President to issue a PLA executive order that facially violates CICA" and "issue a permanent injunction rescinding the PLA Requirements" generally. *See* Pl.'s MJAR at 39; *see also id.* at 18 (requesting the Court provide "declaratory and injunctive relief sufficient to cure the Government's ongoing violation of CICA in this Solicitation and others issued by the Government"), 34 ("Injunctive relief is warranted here with respect to this Solicitation and with respect to the Government's ongoing violation of CICA through use of the PLA Requirements in all large-scale construction procurements.") (emphasis omitted).

In response, the government argues the PLA requirement in WSLP-114 does not restrict full and open competition because plaintiff can still submit a bid. Gov't's Cross-MJAR at 34–35. Moreover, the government maintains USACE's decision to include a PLA requirement was not arbitrary and capricious because "[t]he administrative record reflects that USACE made a rational determination that a PLA is necessary to satisfy its needs for the WSLP-114 project." *Id.* at 37. According to the government, EO 14063 does not facially violate CICA because the implementing FAR regulations "provide a framework for agencies to determine whether PLAs are necessary to meet their needs in large-scale construction contracts." *Id.* at 20. The government argues Congress delegated authority for EO 14063 directly to the President through FPASA, and the PLA requirements do not concern "a transformative expansion of agency authority with vast economic or political significance that might trigger the application of the major questions doctrine." *Id.* at 33–34. The government asserts this Court lacks jurisdiction to

- 8 -

hear a facial challenge because plaintiff's challenge extends beyond a procurement-specific bid protest authorized for review by the Court of Federal Claims in the Tucker Act and instead challenges the Executive Branch's authority to promulgate regulations. *Id.* at 18–19. In response to plaintiff's request for injunctive and declaratory relief for the as-applied challenge, the government asserts "the potential harm to the Government and residents of Southeast Louisiana from [plaintiff]'s requested injunction outweighs the harm to [plaintiff] if the procurement proceeds as planned with a PLA requirement," and for the facial challenge, the government argues "[t]his Court lacks authority to rescind executive orders and regulations in a bid protest and, in any event, [plaintiff] has not demonstrated irreparable harm in the absence of such an injunction" rescinding EO 14063. *Id.* at 45–48. As such, the government requests the Court grant its Cross-MJAR and deny plaintiff's requested relief. *See id.* at 49.

## III.    Legal Standards

This Court outlined the legal standard for this case in detail in *MVL I. See* 174 Fed. Cl. at 458–59. The Court excerpts relevant portions below, preserving the original section headings:

### A.    Bid Protest Jurisdiction and APA Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act ("ADRA"), provides this court jurisdiction over "action[s] by an interested party objecting to a solicitation by a federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Administrative Dispute Resolution Act, Pub. L. No. 104-320, 28 U.S.C. § 1491(b)(1) (1996). . . . The Court evaluates bid protests under the framework laid out in Section 706 of the Administrative Procedure Act. 28 U.S.C. § 1491(b)(4); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); MATTHEW H. SOLOMSON, COURT OF FEDERAL CLAIMS: JURISDICTION, PRACTICE, AND PROCEDURE § 8-37 (2016) (footnote omitted) (first citing 28 U.S.C. § 1491(b)(4); and then quoting 5 U.S.C. § 706(A), (D)); 28 U.S.C. § 1491(b)(4) (2024) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.")). "[T]he proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (quoting *Adv. Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)). An agency's action is arbitrary, capricious, or an abuse of discretion if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*MVM*").

. . .

### B.    Judgment on the Administrative Record in a Bid Protest

"[RCFC] 52.1(c) provides for judgment on the administrative record." *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 104 (2011); *see also Bannum*, 404 F.3d at 1353–54.  The court may set aside an agency action if plaintiff has proven "either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332.  The rational basis test requires the court to ask "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P.*, 906 F.3d at 992 (quoting *Banknote*, 365 F.3d at 1351).  "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa*, 238 F.3d at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).  "*[D]e minimis* errors do not require the overturning of an award." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996).

### C.    Permanent Injunction

When deciding whether a permanent injunction is warranted, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).

*Id.*

## IV.    Whether USACE's Amendment to WSLP-114 adding a PLA Requirement Was Arbitrary and Capricious in Violation of CICA

Plaintiff argues USACE's PLA requirement for WSLP-114 violated full and open competition under CICA because USACE excluded responsible sources without analyzing whether a PLA was necessary for WSLP-114.  Pl.'s MJAR at 24, 26.  The Federal Circuit explained, in *NGS*, "CICA generally requires 'full and open competition through the use of competitive procedures.'"  *NGS*, 923 F.3d 977, 982 (Fed. Cir. 2019) (quoting 41 U.S.C. § 3301(a)(1)).  Moreover, full and open competition typically means all responsible sources are permitted to compete.  *Id.* at 983 (citing 41 U.S.C. § 107).  A solicitation requirement does not automatically violate CICA, however, just because it effectively excludes bidders who cannot meet the requirement.  *Id.* at 985.  An agency can cite exceptions to CICA, or, as the Federal Circuit explained in *NGS*, can show such an exclusionary requirement is tailored to the agency's needs for the solicitation.  *Id.* at 985–86.  Accordingly, *NGS* reviewed three criteria to determine whether a solicitation requirement precludes full and open competition:  (1) whether the requirement excludes bidders from competition, *see id.* at 983; (2) if so, whether the

requirement is tailored to the agency's needs for the solicitation, *see id.* at 986; and (3) if exclusionary and untailored, whether the requirement was added pursuant to a statutory exception to CICA, *see id.* In *MVL I*, this Court applied the three *NGS* criteria to review PLA requirements for compliance with CICA's full and open competition requirement. *See MVL I*, 174 Fed. Cl. at 462, 467–68 (citing *NGS*, 923 F.3d at 982). First, this Court reviewed whether the PLA requirements effectively excluded offerors from competition for the solicitation. *See id.* at 469 (citing *NGS*, 923 F.3d at 985). Second, this Court reviewed whether the agencies' market research showed PLA requirements were tailored to the solicitations. *See id.* at 470 (citing *NGS*, 923 F.3d at 982). Third, this Court reviewed whether the agencies added the PLA requirements pursuant to a statutory exception to CICA. *See id.* at 470–71 (citing *NGS*, 923 F.3d at 986).

At oral argument for this case, the Court asked the government what should "change[] the court's analysis in this case" to distinguish it from *MVL I*. *See* Tr. at 17:22–24, 19:17–22. The government responded, "the market research is different," and clarified nothing else would change the analysis. *See* Tr. at 17:22–24 ("[THE COURT:] I guess what's different here? [THE GOVERNMENT]: Well, the market research is different . . . here."), 19:17–22 ("THE COURT: So what changes the court's analysis in this case is the market research? [THE GOVERNMENT]: Correct. THE COURT: Anything else? [THE GOVERNMENT]: Specific to the allegations raised by . . . plaintiff, I don't think so."). Accordingly, as in *MVL I*, the Court applies the Federal Circuit's *NGS* framework, considering USACE's market research for WSLP-114. Given the government identifies market research as the primary reason the PLA requirement complies with CICA, the Court starts with the tailoring criterion from *NGS* before analyzing exclusion and statutory exceptions. First, the Court analyzes whether USACE's market research showed a PLA requirement was tailored to its needs for solicitation WSLP-114. Second, the Court determines whether the PLA requirement precluded full and open competition by excluding bidders from competing for solicitation WSLP-114. Third, the Court assesses whether USACE properly invoked a statutory exception to CICA's requirement for full and open competition.

## A.    Whether the PLA Requirement was Tailored to Achieve USACE's Needs for WSLP-114

The government argues USACE determined a PLA requirement was tailored to its needs for WSLP-114 because EO 14063 designated PLAs "generally necessary for large-scale construction projects" to provide "structure and stability," and USACE's market research showed no exceptions to EO 14063 applied for WSLP-114. *See* Gov't's Cross-MJAR at 3–4. In *NGS*, the Federal Circuit similarly considered a solicitation requirement uniformly applicable to a large class of contracts to ensure "business continuity" and a "competitive marketplace." *See NGS*, 923 F.3d at 986. There, in an effort to ensure continuous service from all sources, the agency used a contract requirement to exclude certain bidders from a solicitation if they exceeded workload caps. *Id.* at 980. Ultimately, the issue before the Federal Circuit in *NGS* was "simply a procedural one—whether the agency complied with . . . CICA . . . when it attempted to address its concerns by developing a blanket policy applicable to *all* MAC [(Medicare administrative contractor)] solicitations that effectively excludes offerors from competing, without documenting the need for such action in light of a particular contract or a particular

offeror." *Id.* at 982.  The Federal Circuit answered in the negative, holding the solicitation requirement had to be "tailored to meet [the agency's] need for a particular procurement" to ensure full and open competition under CICA.  *Id.* at 986.  In finding the agency failed to tailor the workload caps to its needs for the solicitation, the Federal Circuit noted "the workload caps [were] uniform parameters applicable to *all* MAC contracts," and "although the government contend[ed] the workload caps [were] tailored to each contract because the Policy reflect[ed] a need for continuous service in each particular . . . jurisdiction . . . [, t]here [was] no indication [the agency] had concerns about continuity within a particular . . . jurisdiction." *Id.*  In short, a solicitation requirement cannot exclude offerors to address broader market concerns, without also addressing concerns specific to the solicitation.  *Id.*  In *MVL I*, this Court applied *NGS* and held PLA requirements were not tailored to the agencies' procurement-specific needs.  *See MVL I*, 174 Fed. Cl. at 469–70 ("Accordingly, the Court finds the PLA mandates have no substantive performance relation to the substance of the solicitations at issue and violate CICA's requirement that procuring agencies 'obtain full and open competition through the use of *competitive* procures.'" (quoting 41 U.S.C. § 3301(a)) (citing *NGS*, 923 F.3d at 982)).  There, this Court found PLA requirements were not tailored to the agencies' needs for the solicitations, given "USACE's decision to *require* a PLA, relying solely on the President's 'policy judgment' . . . , rather than actual market survey data supporting USACE's . . . determination to not include a PLA [was] arbitrary and capricious." *Id.* at 466 (citing *Ala. Aircraft*, 586 F.3d at 1375), 469–70 (citing 41 U.S.C. § 3301(a)); *NGS*, 923 F.3d at 982.  Here, the Court again applies *NGS* to determine whether USACE's PLA requirements were tailored to its needs specific to WSLP-114.

The government argues a PLA requirement was specifically necessary for WSLP-114 for two reasons:  (1) EO 14063 provides a sufficient list of benefits necessary to justify a PLA requirement for WSLP-114; and (2) to the extent the benefits of a PLA must be confirmed for each solicitation, USACE did so for WSLP-114 through market research which ruled out exceptions to the PLA mandate in EO 14063.  *See* Gov't's Cross-MJAR at 3–4.  The Court considers each of the government's arguments through the lens of the Federal Circuit's holding in *NGS*.

The government first argues EO 14063 identified all the benefits of a PLA requirement necessary for USACE to justify adding one to WSLP-114.  *See* Tr. at 18:14–16 ("[THE GOVERNMENT:]  [T]he agency relied on the executive order in terms of the benefits that would be provided . . . by a PLA.").  The government asserts USACE did not need to determine whether a PLA requirement would be appropriate, necessary, or legal for this procurement independent of Presidential policy.  Gov't's Reply at 13–14.  Moreover, at oral argument, the Court asked the government why USACE required a PLA requirement for WSLP-114—the government responded:  "to promote economy and efficiency in accordance with Executive Order 14063."  Tr. at 15:21–24; *see also* AR Tab 24 at 3635 (Acquisition Plan, approved January 28, 2025).  For a requirement to be tailored to an agency's needs for a procurement under *NGS*, the agency must "document[] the need for [an exclusionary solicitation requirement] in light of a particular contract or a particular offeror."  *See NGS*, 923 F.3d at 982.  While the government lists generally applicable benefits of a PLA requirement from EO 14063, such as a reduced "risk of there being labor disruptions and things . . . of that nature," Tr. at 18:4–6, the government does not identify how the benefits would apply to WSLP-114, *see* Tr. at 18:7–11 ("THE COURT:  So on that, what evidence is there in the record of [labor-disruption risk]?  [THE GOVERNMENT:]

[T]he executive orders provided that these are the benefits that are to apply . . . from the inclusion of a PLA."). When pressed at oral argument for specific PLA benefits for WSLP-114, the government could not identify any labor disruption risks specific to WSLP-114 or the surrounding geography. *See id.* Moreover, of twenty-five separate projects the government procured to prepare the sites for WSLP-114, zero included a PLA requirement. Tr. at 13:16–18 ("[THE COURT:] [N]one of them, to the best of your knowledge, included a PLA requirement? [USACE:] No, sir."). Although none of the support projects were large-scale construction projects subject to EO 14063, the absence of PLA requirements on twenty-five projects USACE "had to do" prior to WSLP-114 is revealing as to the concern USACE had for labor disruption risk in the area. *See* Tr. at 12:14–24. In *NGS*, the Federal Circuit required more than a broad policy goal to substantiate a specific procurement requirement, so, here, USACE must justify a PLA requirement for WSLP-114 beyond an Executive Order which assumes PLAs will benefit every large-scale construction contract across the nation. *See NGS*, 923 F.3d at 986 ("[T]he workload caps [were] uniform parameters applicable to *all* MAC contracts[, and] although the government contend[ed] the workload caps [were] tailored to each contract because the Policy reflect[ed] a need for continuous service in each particular . . . jurisdiction . . .[,] [t]here [was] no indication [the agency] had concerns about continuity within a particular . . . jurisdiction."); *MVL I*, 174 Fed. Cl. at 466 ("USACE's decision to *require* a PLA, relying solely on the President's 'policy judgment' as implemented by the FAR Council, rather than actual market survey data supporting USACE's prior determination to not include a PLA is arbitrary and capricious."). Absent USACE's documentation of how the benefits listed in EO 14063 would apply to WSLP-114 specifically, EO 14063 is not independently sufficient to show USACE's PLA requirement was tailored to its needs for WSLP-114. *See id.*

The government then argues, if EO 14063 was not sufficient on its own to justify a PLA for WLSP-114, USACE's market research demonstrates a PLA requirement was tailored to WSLP-114. *See* Tr. at 16:5–14 ("THE COURT: Is there anything unique about this procurement that requires a PLA? [THE GOVERNMENT:] [T]he market research is certainly different than others that the court has seen"); 17:3–8 ("THE COURT: It's a correct summary, then, that the PLA requirement was added solely as a result of the executive order? [THE GOVERNMENT]: No, as a result of the executive order and the procurement-specific market research that was done for the WSLP-114 procurement."). In *NGS*, the Federal Circuit held a restrictive solicitation requirement must address the agency's concerns for a specific solicitation. *See* 923 F.3d at 982. Accordingly, for the government's market research argument to succeed, the government must show the market research demonstrated a PLA requirement would "promote economy and efficiency in accordance with Executive Order 14063" with specific regard to WSLP-114. *See id.* at 986 ("Here, instead of being tailored to the needs of a particular contract, the workload caps [were] uniform parameters applicable to *all* MAC contracts."). The government concedes, however, the market research merely parrots the results of a survey asking whether potential bidders would bid on WSLP-114 if it included a PLA requirement. Tr. at 13:24–14:7 ("THE COURT: What was the extent of the market research analysis? [THE GOVERNMENT]: With regard to PLAs, it was primarily the . . . sources sought notice that was issued in June of 2024. It included a question with regard to . . . whether the respondents could meet a PLA requirement for a project of $35 million or more. And the results of that were five of the seven apparently responsible respondents"). In full, the market research section of the Determination for Use of Project Labor Agreement (PLA) states:

A sources sought was advertised on 7 June 2024 requesting sources specific to WSLP-114. Nine (9) responses were responded to the sources sought synopsis, five (5) of which provided an affirmative response on the ability to meet the PLA requirement. Sufficient competition is anticipated for the Government to obtain a fair and reasonable price for the requirement.

AR Tab 21 at 3605 (Memorandum Regarding Applicability of the PLA Exceptions, dated October 31, 2024). USACE's market research merely confirmed a PLA requirement would still leave five bidders—but it did not actually ask and answer the necessary question: whether USACE required a PLA to meet its needs for solicitation WSLP-114. *See NGS*, 923 F.3d at 986. Instead, USACE evaluated whether any of the five EO 14063 PLA exceptions, on their own or taken together, demonstrated a PLA requirement was necessary for USACE's specific needs for WSLP-114.[2] First, USACE concluded the EO "project duration and complexity" exception did not apply because WSLP-114 is long and complex, but USACE did not explain why a PLA would facilitate the duration and complexity of WSLP-114, merely stating "[t]his work supports the use of a PLA." AR Tab 21 at 3605 (Memorandum Regarding Applicability of the PLA Exceptions, dated October 31, 2024). Second, USACE concluded the EO single craft or trade exception did not apply, but did not analyze WSLP-114's specific need for a PLA due to multiple crafts or trades, merely stating "[t]he project will require multiple construction contractors and/or subcontractors employing workers in multiple crafts or trades to support the use of a PLA." *Id.* Third, USACE concluded the EO specialized construction work exception did not apply, but did not explain why this determination showed specific need for a PLA for WSLP-114, merely stating "[t]he project does not involve specialized construction work that is only available from a limited number of contractors or subcontractors, which supports use of a PLA." *Id.* Fourth, USACE concluded the EO unusual and compelling urgency exception did not apply, but did not show how the lack of urgency demonstrates a specific need for a PLA for WSLP-114, merely stating "[t]here are no unusual or compelling Agency needs which would support an exemption to the PLA requirements." *Id.* Finally, USACE made a conclusory determination "[t]he use of a PLA is not inconsistent with any Federal statues, regulations, or Presidential memoranda." AR Tab 21 at 3606 (Memorandum Regarding Applicability of the

---

[2] The government conceded USACE's market research and PLA assessment did nothing more than rule out EO 14063's exceptions to the PLA mandate. *See* Tr. at 16:15–17:2 ("THE COURT: In the opening brief, [government], you state, 'The Army Corps reasonably determined there was no basis for concluding that a PLA was not necessary for the WSLP-114 procurement.' That statement seems to indicate that there's a presumption of a PLA that applies and that analysis is only necessary to remove a PLA requirement. Would you say that that's how the Army Corps assessed a PLA requirement? [THE GOVERNMENT]: There was a presumption . . . that a PLA requirement would apply . . . pursuant to the executive order, unless . . . there were reasons not to, exceptions provided by the executive order and the FAR implementing it."). Without more, a finding the exceptions were inapplicable is not an individualized determination USACE needed a PLA requirement for WSLP-114. *See MVL I*, 174 Fed. Cl. at 469–70 (rejecting the government's argument the "agencies can look at those exceptions and determine not to apply" a PLA requirement) ("When compared to the prior administration's discretionary policy, the PLA mandate's exceptions—though theoretically discretionary—are rendered functionally meaningless if the agencies take the uniform approach of never seeking an exception regardless of the strength of the market survey data recommending against the inclusion of a PLA"); *see also NGS*, 923 F.3d at 986 ("[A]lthough the government contends that the workload caps [were] tailored to each contract because the Policy reflects a need for continuous service in each particular MAC jurisdiction . . .[, t]here is no indication that CMS had concerns about continuity within a particular MAC jurisdiction.").

PLA Exceptions, dated October 31, 2024). As the Court's analysis in this decision demonstrates, compliance with CICA requires more than a sentence from USACE stating the PLA requirement complies with CICA.

At oral argument, the government agreed the benefits of PLAs listed in EO 14063 do not necessarily apply for every large-scale construction procurement. *See* Tr. at 30:11–21. The government nonetheless argued EO 14063 and its exceptions are sufficient to determine whether the benefits of PLAs would apply. To better understand the government's reasoning, the Court proposed a hypothetical at oral argument:

> [THE COURT:] If I'm in a location, let's say south Florida, where there is no union construction workers, it's possible to complete a job with union construction, you would just need to bring them all in from New York or New Jersey. Conversely, if I'm in New York or New Jersey, completing a union construction project, that's easy, everybody is in union construction. So what's good for New York and New Jersey is not necessarily good for Florida, correct?

> [THE GOVERNMENT:] Yes. I think that's right.

The Court pressed the government further, adding details to the hypothetical Florida procurement: "[N]ow we have a group of 10, five are PLA, five are no PLA. Five are $50 million, five are $100 million . . . if we did not know the information on pricing . . . [what is the] CICA analysis?" Tr. at 71:6–9; 74:13–23. The government responded, "the agency is permitted" to include a PLA requirement as long it makes "an individualized determination . . . based on the executive order and the exception guidance." Tr. at 74:24–75:8. In sum, even where there is no risk of labor disruption, and even when a PLA requirement would significantly reduce price competition, the government argues all that is needed for full and open competition is a determination no PLA exceptions would apply. *Id.* In *NGS*, the Federal Circuit considered similar geographical distinctions to address a "[p]olicy designed to address continuity concerns more generally by looking to the market as a whole." *See NGS*, 923 F.3d at 986. There, a broad, market-wide concern was not enough to tailor the policy to a procurement—instead the policy had to be "tailored to meet [the agency's] needs for a particular procurement . . . within a particular . . . jurisdiction." *Id.* Thus, in the hypothetical posed by the Court, *NGS* requires procurement-specific tailoring by geography to justify a PLA in Florida versus New York. *Id.* When asked about the hypothetical PLA requirement for the Florida procurement, however, the government responded, "it wouldn't be a violation of CICA to include [a PLA] requirement" as long as the agency determines no PLA exceptions apply. Tr. at 75:20–76:2. Similarly, as in the Florida hypothetical, USACE's WSLP-114 solicitation is located in Louisiana, a location for which the government failed to cite any specific labor-disruption risk. Accordingly, absent a specific justification for WSLP-114 based on the risks a PLA requirement is meant to address, compliance with the executive order and its exceptions is not a sufficient procurement-specific basis for a PLA requirement to comply with CICA. *See NGS*, 923 F.3d at 986 ("There is no indication that CMS had concerns about continuity within a particular MAC jurisdiction."); *MVL I*, 174 Fed. Cl. at 450 (finding the agencies addition of PLA requirements arbitrary and capricious despite findings "none of the FAR exceptions applied to exempt the project from the PLA requirements"), 441 ("The

agencies' 2024 implementation of the mandate—ignoring the agencies' own market research concluding project labor agreements would be anticompetitive—relying solely on executive order presidential policy is arbitrary and capricious"), 469 ("Indeed, agencies now look only to 'studies supporting the use of PLAs' cited by Biden's EO and the FAR Council, rather than tailoring their decisions to the market data evidence for each specific project specification." (citations omitted)).

Even more troubling than USACE's failure to identify procurement-specific benefits for a PLA requirement is USACE's failure to address record evidence a PLA could be detrimental to the procurement. Jeffrey Waguespack, the chief of USACE's New Orleans Business Oversight Branch, generally warned of issues with PLAs where the work under the solicitation would be performed: "Historically, Louisiana contractors have not responded very favorably to PLAs so up to this point, so MVN KOs usually document an exception in the PCF file, based on Market Research showing that PLAs would reduce the number of interested contractors and possibly raise the price of the contract." *See* AR Tab 46 at 7745 (USACE E-mail Transmitting New PLA Rules and Guidance, dated December 26, 2023). In response to the sources sought survey, XXX devoted two pages of its response to explain its view a PLA would be detrimental to WSLP-114:

> A PLA's exclusionary impact would undermine the availability of skilled workers for this project and intensify numerous challenges currently facing the construction industry and military construction contracting community, including a skilled labor shortage exceeding half a million people in 2023, material cost increases 40% above pre-pandemic levels, supply chain disruptions, and new government regulations.

AR Tab 13 at 3558–60 (XXXXXXXXXXXX Response to Sources Sought Notice, submitted June 13, 2024). Similarly, XXXXX expressed reservations about a PLA requirement, noting:

> If there is a government imposed PLA there may be relative cost impacts due to:
>
> - Adverse contract language labor unions may want to include in the PLA (i.e., excessive manning provisions, work restrictions)
> - Possible specified use of unnecessary craft unions, inability to use non-union specialty contractors, inability to use non-union small and disadvantaged businesses (There are a limited supply union specialty and union small businesses available for this type of work in the New Orleans area).
> - There may also be cost & schedule impacts because union work rules frequently impede efficient production.

AR Tab 14 at 3563 (XXXXXXXXXXXXXXX Response to Sources Sought Notice, submitted June 14, 2024). At oral argument, the government conceded there was no evidence USACE conducted any analysis to determine these concerns were inapplicable or would be outweighed by specific benefits to WSLP-114. *See* Tr. at 42:3–9 ("THE COURT: Is there any detail in the record where the Army Corps analyzed the issues raised by XXXX, XXXXX, or Mr. Waguespack regarding the PLA impact for this work? [THE GOVERNMENT]: I'm not aware of anything where there's specific written analysis of the statements made by XXXXXXXXX or

Mr. Waguespack."). While the evidence of the potential detriment of a PLA did not result in an agency recommendation against a PLA as in *MVL I*, the failure to identify procurement-specific benefits for a PLA, paired with a failure to meaningfully analyze potential detriments, is arbitrary and capricious, particularly given *NGS*'s requirement USACE justify a PLA requirement on a procurement-specific basis. *See NGS*, 923 F.3d at 986, 990; *see also Ala. Aircraft*, 586 F.3d at 1375 ("Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" (quoting *MVM*, 463 U.S. at 43)); *cf. MVL I*, 174 Fed. Cl. at 441 ("The agencies' 2024 implementation of the mandate—ignoring the agencies' own market research concluding project labor agreements would be anticompetitive—relying solely on executive order presidential policy is arbitrary and capricious.").

The absence of USACE's analysis of benefits or disbenefits of a PLA requirement for WSLP-114 reveals a more fundamental flaw in the government's reasoning—USACE justifies a PLA requirement *post hoc* by ruling out exceptions, but never determined whether a PLA should have been required in the first place. *See* Tr. at 15:15–24 ("THE COURT: What . . . was the reason . . . the Army Corps added the PLA requirement? [THE GOVERNMENT:] [T]o promote economy and efficiency in accordance with Executive Order 14063."). In *MVL I*, the agencies first analyzed whether a PLA would benefit the procurement and, after recommending against a PLA requirement, still included one based on the absence of an applicable exception. *See, e.g.*, *MVL I*, 174 Fed. Cl. at 447 ("USACE initially determined that inclusion of the FAR PLA clauses is not suitable for the project, . . . but in March 2024, USACE made a new determination to include a PLA requirement, finding no exception to use of a PLA applied to the project." (cleaned up)). Here, USACE did not even complete the first step—it assumed a PLA would be required and launched straight into the exceptions. Tr. at 15:15–24 ("THE COURT: Well, does the record indicate that the agency was discussing a PLA at all before June of 2024? [THE GOVERNMENT]: Not that I'm aware of, no. THE COURT: What would you say was the reason why the Army Corps added the PLA requirement? [THE GOVERNMENT]: The Army Corps of Engineers added the PLA requirement to promote economy and efficiency in accordance with Executive Order 14063"). The only material difference between *MVL I* and this case was an agency recommendation against PLAs in *MVL I*. *See id.*; *MVL I*, 174 Fed. Cl. at 447. Here, USACE cannot skirt its responsibilities for rational analysis by simply declining to evaluate the need for a PLA. *See NGS*, 923 F.3d at 982, 986, 990 (requiring an agency to "document[] the need for [an exclusionary solicitation requirement] in light of a particular contract or a particular offeror"); *MVL I*, 174 Fed. Cl. at 466. USACE must analyze and explain why it needs a PLA specifically for WSLP-114, especially when faced with evidence a PLA may be detrimental to the procurement. *See NGS*, 923 F.3d at 982, 986, 990; *MVL I*, 174 Fed. Cl. at 466 ("The Court finds USACE's decision to *require* a PLA, relying solely on the President's 'policy judgment' as implemented by the FAR Council, rather than actual market survey data supporting USACE's prior determination to not include a PLA is arbitrary and capricious" (citations omitted)). USACE's implementation of the PLA mandate—failing to identify the agency's needs for a PLA specific to the procurement, failing to analyze disbenefits from a PLA requirement, and relying solely on executive order presidential policy to justify a PLA requirement—is arbitrary and capricious. *See NGS*, 923 F.3d at 986, 990 (finding an

exclusionary contract requirement precluded full and open competition when not tailored to the needs of the solicitation); *Ala. Aircraft*, 586 F.3d at 1375 ("Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" (quoting *MVM*, 463 U.S. at 43)).

## B.    Whether the PLA Requirement Effectively Excluded Certain Offerors from Competition

Having found USACE arbitrarily and capriciously included a PLA requirement not tailored to the specific needs of WSLP-114, the Court now determines whether doing so precluded full and open competition in violation of CICA.  *See NGS*, 923 F.3d at 986. As the Federal Circuit explained in *NGS*, "CICA generally requires 'full and open competition through the use of competitive procedures.'"  923 F.3d at 982 (citing 41 U.S.C. § 3301(a)(1)). "As used in § 3301, 'competitive procedures' is defined as 'procedures under which an executive agency enters into a contract pursuant to full and open competition.'"  *Id.* (citing 41 U.S.C. § 152).  "[T]he term 'full and open competition', when used with respect to a procurement, means that all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement."  *Id.* at 983 (citing 41 U.S.C. § 107).  *NGS* clarifies, for a solicitation requirement which is not tailored to the needs of the solicitation, the requirement precludes full and open competition if it "effectively excludes certain offerors from competition."  *See id.* at 986; *see also id.* at 985–86 (finding a solicitation requirement "is not necessarily objectionable simply because that requirement has the effect of excluding certain offerors," but clarifying an exclusionary requirement precludes full and open competition if not "tailored to meet [the agency's] needs for a particular procurement").

The mere fact an offeror can submit a bid does not mean a solicitation requirement does not exclude the offeror.  *See NGS*, 923 F.3d at 985; *see also MVL I*, 174 Fed. Cl. at 437 ("'[D]espite the government's efforts to show that it would be meaningful for [a non-PLA] offeror . . . to submit a proposal,' the Court is not persuaded.  Under the PLA mandate, the Court finds 'a responsible offeror that [declines to enter a PLA] is not given the same opportunity to win an award as other offerors that submitted awardable proposals.' (quoting *NGS*, 923 F.3d at 985)).  Importantly, "the mere ability to submit an offer" does not qualify as full and open competition where "a submission may be entirely futile in light of the solicitation's [restrictive requirement]."  *NGS*, 923 F.3d at 984.  Instead, for full and open competition, such a bid must be "meaningful" and not "futile."  *Id.* at 984–85.

Before addressing the parties' arguments, the Court notes the government has conceded the PLA requirement does, in fact, exclude from WSLP-114 an offeror who would be a responsible source but for the PLA requirement.  Tr. at 42:10–13 ("THE COURT:  At least one responsible source specifically indicated that they would not participate in the project if there were a PLA requirement, correct?  [THE GOVERNMENT]:  Correct.").  In its response to the sources sought, XXX indicated it was an otherwise responsible source willing to bid on WSLP-114, but not if it included a PLA requirement.  *See* AR Tab 13 at 3557–61 (XXX XXXXXXXXX Response to Sources Sought Notice, submitted June 13, 2024); *see also* Gov't's

Cross-MJAR at 36 ("Of the nine respondents to the sources sought notice, only XXX appears to be both a responsible source and unwilling to enter into a PLA." (citation omitted)). Likewise, B&G protests the PLA requirement on the basis it would submit a bid if not for the PLA requirement. *See* Pl.'s Motion at 2 ("But for the Agency's prejudicial use of the PLA Requirements, B&G would offer its most competitive bid to the Agency."). The government not only agreed at least one responsible source would not bid if there were a PLA requirement, but also agreed the effect of this exclusion would be to reduce competition. *See* Tr. at 42:10–17 ("THE COURT:  At least one responsible source specifically indicated that they would not participate in the project if there were a PLA requirement, correct? [THE GOVERNMENT]: Correct. THE COURT:  Is the exclusion of at least one competitor a reduction in competition? [THE GOVERNMENT]:  I mean, I guess it's one less potential bidder."). The government contends, however, "just because one bidder is unwilling to meet the government's requirements doesn't mean that there's not full and open competition." Tr. at 42:17–19. The government further clarifies it would not accept any proposal without a PLA. *See* Tr. at 20:9–17 ("THE COURT:  So would the Army Corps accept a proposal that did not include a PLA? [THE GOVERNMENT]:  Under this solicitation, no.").

The government argues, "[t]he inclusion of a contractual requirement in a solicitation that some otherwise responsible offerors may not be able to meet does not cause the solicitation to provide for less than full and open competition." Gov't Cross-MJAR at 21 (emphasis omitted). Rather, according to the government, such a contractual requirement merely narrows the pool of potential responsible sources to those willing to enter a PLA agreement. *Id.* at 23–24 (citing *Oracle America, Inc. v. United States*, 975 F.3d 1279, 1287–95 (Fed. Cir. 2020)). Thus, given the PLA requirement is a contractual requirement—and because "[r]esponsibility refers to an offeror's apparent ability and capacity to perform all contract requirements"—the government argues a PLA requirement does not exclude responsible sources from the procurement, but narrows the pool of responsible sources. *See id.* at 21–24, 21 n.4 (citing *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1034 n.2 (Fed. Cir. 2009); *see also CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1352–56 (Fed. Cir. 2008) ("*CHE*").

The government analogizes a PLA requirement to the contract requirements at dispute in *CHE*. *Id.* at 22. (citing 552 F.3d at 1352–56). In *CHE*, the plaintiff protested an agency's decision to bundle hardware and software maintenance requirements into one solicitation. 552 F.3d at 1352. The plaintiff could perform the hardware maintenance requirements but would have been excluded from the solicitation because it could not perform the software maintenance requirements. *Id.* at 1353. The agency bundled hardware and software based on its operational needs, given "separate hardware and software maintenance providers could disrupt mission-critical service and maintenance response time." *Id.* The agency supported its decision with a contracting officer representative's memorandum (to "la[y] a framework for the agency's rational basis") and affidavit (to "build[] on the agency's rational basis" which explained "in great detail" the needs and risks of the agency addressed through bundling). *Id.* at 1354. The Federal Circuit ruled the agency could bundle to the exclusion of the plaintiff because the agency had "show[n] that undivided maintenance service is rationally related to critical mission needs, especially where the software and hardware aspects of the system are highly complex and tightly integrated." *Id.* at 1356.

Plaintiff agrees with the government agencies have 'a responsibility to assess risks and avoid them before they become a historical fact but argues "an assessment is actually required." Pl.'s MJAR at 6 (quoting Gov't Cross-MJAR at 38 (quoting *CHE*, 552 F.3d at 1355)). While the government argues USACE did not have to "affirmatively determine whether a PLA requirement would be appropriate, necessary, or legal for this Procurement . . . independent of Presidential policy," *see* Gov't's Reply at 13–14, the government's argument is misguided because USACE failed to rationally determine a PLA requirement would benefit the agency with specific regard to WSLP-114.  *See* Section IV.A, *supra*.  In *CHE*, on the contrary, the agency provided a detailed affidavit and memo explaining the rational basis relating the undivided maintenance service with critical mission needs.[3]  *CHE*, 552 F.3d at 1354, 1356.  In *NGS*, the Federal Circuit distinguished the facts of *CHE* on the same basis as the Court does here and in *MVL I*, finding the requirements "unlike the requirements at issue in [*CHE* because they were] not requirements tailored to meet [the agency's] needs for a particular procurement."  *NGS*, 923 F.3d at 985; *MVL I*, 174 Fed. Cl. at 469–70 (rejecting the government's argument the PLA requirement was "tailored in the sense that there's exceptions, and so agencies can look at those exceptions and determine not to apply it" (cleaned up)).  The government tries to distinguish this case from *MVL I* on the basis of more favorable market research, *see* Gov't's Cross-MJAR at 23 n.5, but, as explained in Section IV.A, *supra*, the *MVL I* market research contradicted the agencies' initial recommendation against a PLA.  Here, as plaintiff stated, USACE never even made an initial finding—it conducted market research only to determine whether any exceptions to EO 14063 applied.  *See* Section IV.A, *supra*.  USACE did not make any determination regarding its needs for a PLA specific to WSLP-114.  *Id.*  For USACE to justify excluding offerors on the basis of a contract performance requirement such as a PLA, USACE was required to rationally determine a PLA was necessary to meet its needs for WSLP-114.  *See NGS*, 923 F.3d at 985–86 ("[*CHE*] merely stand[s] for the unremarkable proposition that a solicitation requirement . . . is not necessarily objectionable simply because [it excludes] certain offerors who cannot satisfy that requirement. . . . Unlike the requirements in [*CHE*, these] are not requirements tailored to meet [the agency's] needs for a particular procurement.").

---

[3] The government also likens this case to *Oracle America, Inc. v. United States* ("*Oracle*"), 975 F.3d 1279 (Fed. Cir. 2020), noting the Federal Circuit rejected Oracle's argument "a solicitation provided for less than full and open competition because the agency knew that only two offerors could meet the challenged eligibility criterion."  *See* Gov't's Cross-MJAR at 23–24 (citing *Oracle*, 975 F.3d at 1292).  *Oracle* does not support the government's position, however, because, there, the administrative record was replete with the agency's procurement-specific needs for the challenged eligibility criterion.  *Oracle Am., Inc. v. United States*, 144 Fed. Cl. 88, 115–16 (2019), *aff'd*, 975 F.3d 1279 (Fed. Cir. 2020).  As the lower court explained:

> The security component of Gate Criteria 1.2 is based on DoD's "minimum security requirements for processing or storing DoD's least sensitive information."  AR 947.  Mr. Van Name explained that the challenged portion of Gate Criteria 1.2 reflects the "minimum criteria necessary for DoD to have confidence that the Offeror's proposed data centers have met the underlying physical security requirements necessary to successfully perform the contract."  *Id.*  Many of the acquisition documents bolster the agency's conviction that use of multiple cloud service providers exponentially increases the challenge of securing data.  We have no reason to doubt the agency's many representations that the Gate Criteria 1.2 security requirements are the minimum that will be necessary to perform even the least sensitive aspects of the JEDI Cloud project.

*Oracle Am.*, 144 Fed. Cl. at 115–16.

The government then argues potential bidders such as XXX and B&G are not actually excluded because "B&G is free to submit a bid." Gov't's Cross-MJAR at 34. The government argues such parties are not excluded—instead they are just unwilling to submit bids because of the contractual performance requirements. *See id.* at 34–35. In this way, the government distinguishes exclusion in this case from an exclusion requiring statutory authorization such as, for example, a small business set-aside excluding large businesses. *See* Tr. at 26:5–27:6 ("[THE GOVERNMENT: The small business set-aside is specifically saying certain class of competitors can't compete with this, regardless of whether they can perform the contract or not. A PLA requirement is a requirement for contract performance itself, . . . so the fact that a particular firm . . . can't meet or is unwilling to meet a . . . a PLA requirement, . . . doesn't mean that there's not full and open competition."). Thus, the government analogizes a PLA requirement to a hard hat requirement, arguing "you can't be awarded the contract if you're not going to comply with the contractual requirements, whether that's cybersecurity, hard hats or PLAs in this case." Tr. at 94:12–15. This Court dismissed a virtually identical argument in *MVL I* because, unlike hard hats or cybersecurity requirements, the agencies had not rationally excluded bidders based on the their specific needs for the solicitations:

> "[D]espite the government's efforts to show that it would be meaningful for [a non-PLA] offeror . . . to submit a proposal," the Court is not persuaded. *See NGS*, 923 F.3d at 985. Under the PLA mandate, the Court finds "a responsible offeror that [declines to enter a PLA] is not given the same opportunity to win an award as other offerors that submitted awardable proposals." *See id.* As discussed *supra*, the record teems with examples of how the Biden EO PLA mandate excludes non-PLA offerors on that basis alone: (1) the terms of the contract do not change if a PLA is included or excluded; (2) the government recognizes plaintiffs are likely otherwise capable of performing the contracts; (3) the agencies can point only to the PLA mandate to justify including PLAs in the solicitations; (4) the agencies declined to seek an exception even after the agencies commissioned market research recommending against the use of PLAs; and (5) even when the agencies received overwhelming data indicating PLAs would increase price, reduce economy and efficiency, and stifle competition—the agencies declined to pursue an exception.

174 Fed. Cl. at 470. For the same reasons cited in *MVL I*, the Court finds non-PLA offerors were impermissibly denied a meaningful opportunity to submit proposals due to a requirement unrelated to the needs of USACE's WSLP-114 solicitation. *See id.* While the government argues XXX and B&G could submit a bid, it also clarifies it would not accept a proposal without a PLA. Tr. at 20:9–17 ("THE COURT: So would the Army Corps accept a proposal that did not include a PLA? [THE GOVERNMENT]: Under this solicitation, no."). The government concedes the underlying work involved in WSLP-114 is unaffected by the inclusion of a PLA requirement. *See* Tr. at 20:23–21:2 ("THE COURT: Does the PLA requirement change any aspect of the underlying work? [THE GOVERNMENT]: No, it would change the terms and conditions of the employment of those performing the work."). As discussed *supra*, the government concedes the only benefits justifying inclusion of a PLA are those outlined in the PLA mandate, does not cite any labor-disruption risks specific to Louisiana to necessitate a PLA for WSLP-114, and did not employ a PLA on any of the twenty-five related procurements. *See* Section IV.A, *supra*. The government further concedes there is no record evidence USACE

analyzed warnings from a USACE staff-member and sources sought respondents regarding whether PLAs could be detrimental to the procurement. *See id.* While few would dispute a hard hat requirement as exclusionary[4] and unrelated to safety concerns, in this case multiple potential bidders dispute a PLA requirement as exclusionary and wholly unrelated to labor-disruption risk in Louisiana—and USACE failed to provide a rational basis for rebutting the bidders' and the staff member's concerns of including the PLA requirement. *See id.* The government seeks to substantiate exclusion of bidders *post hoc* by ruling out exceptions and assuming the benefits of a PLA listed in EO 14063 apply to WSLP-114. *See id.* Considering the PLA requirements effectively exclude bidders and because USACE failed to make a rational determination a PLA requirement furthers USACE's needs for WSLP-114 to comply with CICA's mandate for full and open competition, USACE "effectively exclude[d] offerors . . . wholly unlike . . . requirements effectively excluded offerors [in *CHE*]," and "preclude[d] full and open competition." *See NGS*, 923 F.3d at 981, 986.

## C.   Whether the USACE Invoked a Statutory Exception to CICA for the PLA Requirement

"Having concluded that the [PLA requirement] precludes full and open competition and effectively excludes certain offerors from competition, [the Court] next consider[s] whether [USACE]'s actions can be otherwise justified." *NGS*, 923 F.3d at 986. As this Court described in *MVL I*: "If an agency seeks to violate CICA's full and open competition requirement, the government must demonstrate express statutory authority to do so. Instructively, the Federal Circuit noted that 'broad provisions' of statutory text 'cannot serve as the express authority necessary to meet [Section 3301] exception,' otherwise 'seemingly any requirement could be justified regardless of its effect on full and open competition.'" *MVL I*, 174 Fed. Cl. at 471 (first citing 41 U.S.C. § 3301(a) ("[E]xcept in the case of procurement procedures otherwise expressly authorized by statute, an executive agency in conducting a procurement . . . shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this division and [FAR]"); then quoting *NGS*, 923 F.3d at 988). For example, in *MVL I*, the government argued 41 U.S.C. § 3306 would allow a PLA requirement precluding full and open competition because Section 3306 "authorizes agencies to specify their needs," and the FAR provisions enacting EO 14063 specified agencies need PLAs. *MVL I*, 174 Fed. Cl. at 471. This Court rejected the government's argument, noting such a broad read of 41 U.S.C. § 3306 asks this Court "to take a red pen to § 3301" to read: "except in the case of procurement procedures otherwise expressly authorized by statute *or Federal Acquisition Regulation*." *Id.*

---

[4] The Court is skeptical a hard hat requirement would ever impose the kind of exclusionary constraints the PLA requirement poses here. USACE's own chief of New Orleans Business Oversight Branch recognizes "[h]istorically, Louisiana contractors have not responded very favorably to PLAs," *see* AR Tab 46 at 7745 (USACE E-mail Transmitting New PLA Rules and Guidance, dated December 26, 2023), whereas hard hat requirements are a virtually universal safety measure in the construction context, *see The Evolution of Head Protection: Safety Helmets vs. Hard Hats*, CONSTRUCTIONDIVE (Jan. 29, 2024), https://www.constructiondive.com/spons/the-evolution-of-head-protection-safety-helmets-vs-hard-hats/705100/ ("Traditionally, hard hats have been synonymous with construction sites"); OSHA Standard 1926.100, 29 C.F.R. § 1926.100(a) ("Employees working in areas where there is a possible danger of head injury from impact, or from falling or flying objects, or from electrical shock and burns, shall be protected by protective helmets.").

While the government in *MVL* advocated a broad read of the exceptions to CICA, here the government does not invoke *any* exception to CICA. Instead, the government argues: "So long as contract performance requirements are rational, they do not violate CICA's full and open competition requirement, and an agency need not invoke a statutory exception in order to include a restrictive provision in the contract." *See* Gov't's Cross-MJAR at 23 (citing *CHE*, 552 F.3d at 1352–56); *see also* Tr. at 25:18–26:19 ("[THE GOVERNMENT:] [T]he fact that a particular firm . . . can't meet or is unwilling to meet a contract performance requirement like a PLA requirement . . . doesn't mean that there's not full and open competition."). Considering USACE's PLA requirement for WSLP-114 precluded full and open competition, *see* Sections IV.A–B, *supra*, USACE must cite a statutory exception to comply with CICA, *see MVL I*, 174 Fed. Cl. at 471 ("If an agency seeks to violate CICA's full and open competition requirement, the government must demonstrate express statutory authority to do so. *See* 41 U.S.C. § 3301(a)."). In both its briefing and at oral argument, the government failed to cite any statutory exception to support USACE's inclusion of PLA requirement on WSLP-114.[5] Given USACE precluded full and open competition by arbitrarily and capriciously requiring a PLA for WSLP-114, *see* Sections IV.A–B, *supra*, and failed to invoke a statutory exception to CICA's full and open competition requirement, *see* Gov't's Cross-MJAR at 23, USACE's amendment of WSLP-114 to include a PLA requirement was arbitrary and capricious in violation of CICA. *NGS*, 923 F.3d at 990 (Fed. Cir. 2019) ("In sum, the Award Limitations Policy precludes full and open competition by effectively excluding an offeror from winning an award, even if that offeror represents the best value to the government. And while agencies may consider market concerns and exclude a particular source for such reasons, the agency did not follow the congressionally designed procedure for doing so in this case."); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (holding a court may set aside an agency action if plaintiff has proven "either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.").

## V. Whether the FAR or CICA Required USACE to Conduct a Pricing Analysis Before Adding a PLA Requirement to WSLP-114

The Court next considers whether the FAR or CICA required USACE to analyze the price impact of a PLA requirement before adding one to WSLP-114. Plaintiff argues USACE violated CICA because "[t]he Agency's failure to meaningfully analyze . . . whether the [PLA]

---

[5] At oral argument, the parties and the Court substantively discussed if any FAR provisions were relevant for purposes of a CICA exception. The government confirmed adequate competition to comply with FAR is a different analysis from compliance with CICA's full and open competition requirement. *See* Tr at 66:15–19 ("THE COURT: Well, does that provision of the FAR, with respect to competition, does that bake in CICA or is CICA a different analysis? [THE GOVERNMENT]: No, I think CICA -- I mean, CICA would be a different analysis"). For context, the FAR provisions implementing EO 14063 allow an exception to the PLA mandate if requiring a PLA would preclude adequate competition at a fair and reasonable price. *See* FAR 22.504(d)(1)(ii) ("*Exceptions to project labor agreement requirements* . . . Market research indicates that requiring a project labor agreement on the project would substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved."). The government does argue USACE considered and ruled out such an exception, after market research demonstrated five bidders would remain after a PLA requirement. *See* Gov't's Cross-MJAR at 39–40 ("USACE's market research amply supports its conclusion that '[s]ufficient competition is anticipated for the Government to obtain a fair and reasonable price for the requirement.'" (internal citations omitted).

requirement would increase costs was arbitrary and capricious and constitutes procurement error." *See* Pl.'s MJAR at 26; *see also id.* at 24 (indicating plaintiff's pricing argument is an as-applied CICA challenge, organized under a section titled, "The PLA Requirements violate CICA as applied"). Plaintiff also argues the lack of pricing analysis fell short of USACE's duties under FAR 22.504(d)(1)(ii) and OMB Memo M-25-29. *See id.* at 15. According to plaintiff, because FAR 22.504(d)(1)(ii) "permit[s] an exception when the number of potential offerors is reduced such that adequate competition at a fair and reasonable price could not be achieved," FAR required USACE to conduct a pricing analysis. *Id.* at 15. Likewise, because OMB Memo M-25-29 allows an agency to except a solicitation from the PLA mandate if a price analysis shows it would increase price by 10% or more, plaintiff argues the OMB memo required USACE to conduct a pricing analysis. *See id.* at 15–16. In sum, plaintiff contends, given PLA requirements may reduce the number of interested contractors, PLA requirements risk price increases and as such, the FAR and CICA require USACE to conduct a price analysis to determine whether the PLA requirement *did* increase prices. Accordingly, the Court next determines whether the FAR or CICA required USACE to analyze a PLA requirement's impact on price before adding a PLA requirement.

### A.      Whether the FAR Required a Pricing Analysis

FAR 22.504(d)(1)(ii) provides for an exception to the PLA requirement when the number of potential offerors would be reduced to such a degree that competition at a fair and reasonable price could not be achieved. In full, the relevant exception states:

(d) *Exceptions to project labor agreement requirements—*
(1) *Exception.* The senior procurement executive may grant an exception from the requirements at 22.503(b), providing a specific written explanation of why at least one of the following conditions exists with respect to the particular contract:
. . .
(ii) Market research indicates that requiring a project labor agreement on the project would substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved.[6]

---

[6] In this case, FAR 22.504(d)(1)(ii) is a fundamental source of confusion for the implementation of EO 14063 in compliance with CICA. Whereas EO 14063 borrows text from CICA to provide an exception when requiring a PLA "would substantially reduce the number of potential bidders so as to frustrate *full and open competition*," *See* EO 14063 § 5(b) (emphasis added), FAR's corresponding exception shifts the standard, substituting in "would substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved." *See* FAR 22.504(d)(1)(ii). Regardless, both FAR and EO 14063 also provide a discretionary exception when "[r]equiring a project labor agreement on the project would otherwise be inconsistent with statutes." *See* EO 14063 § 5(c); 22.504(d)(1)(iii). Because both FAR and EO 14063 allow an exception to comply with statutes (*i.e.*, CICA), an additional exception to ensure adequate competition implies a PLA requirement might comply with CICA, but still risk inadequate competition. For example, a scenario may exist where full and open competition is present because a PLA requirement is tailored to an agency's needs for a solicitation (allowing exclusion without precluding full and open competition), but the PLA requirement's exclusion reduces the set of responsible sources to fewer than 2 or 3 bidders. Section IV, *supra.* Although FAR 22.504(d)(1)(ii)'s use of the word "competition" appears terminologically related to full and open competition under CICA, compliance with adequate competition under FAR 22.504(d)(1)(ii), on its own, is insufficient to demonstrate compliance with full and open competition under CICA.

> (*See* 10.002(b)(1) and 36.104).  A likely reduction in the number of potential
> offerors is not, by itself, sufficient to except a contract from coverage under this
> authority unless it is coupled with the finding that the reduction would not allow
> for adequate competition at a fair and reasonable price.

*See* FAR 22.504(d)(1)(ii) (footnote added).  OMB Memo M-25-29 cites additional FAR
provisions to clarify at least two bidders (or three for sealed bids) constitutes adequate
competition at a fair and reasonable price.  *See* OMB Memo M-25-29.  The memo also allows
for an exception to the PLA mandate if an agency conducts a pricing analysis and finds the PLA
mandate would reduce competition such that the price of the contract would increase by more
than ten percent.  *See id.*  The relevant portion of the OMB memo states in full:

> Subject to the particular findings of market research, including market conditions
> in the specific geographic region where the construction project is planned, for
> purposes of this exception, two qualified offers should generally be sufficient to
> provide adequate price competition for negotiated contracts (FAR 15.403-l(c)(l))
> and three or more qualified bids is sufficient to provide adequate price competition
> for sealed bids (FAR 14.4081 (b)).  If adequate price competition can be achieved,
> use of this exception would not be appropriate, even if the number of offerors who
> indicate they will not compete because of the PLA is significantly higher than the
> number of sources who have expressed an intent to compete.  If, based on market
> research for a given project, two or more offerors express interest (or three bids for
> sealed bidding) but prices are expected to be higher than the government's budget
> by more than 10 percent due to the PLA requirement, the agency may use this
> finding to support a determination that fair and reasonable pricing cannot be
> achieved.

*See id.* at 2.  FAR 15.403-1(c)(1) defines "adequate price competition" in the context of
exceptions to obtaining certified cost or pricing data to determine a fair and reasonable price,
stating in part:

> (1) *Adequate price competition*.
>
> (i) A price is based on adequate price competition when—
>
> (A) Two or more responsible offerors, competing independently, submit
> priced offers that satisfy the Government's expressed requirement

*See* FAR 15.403-1(c)(1)(A).

Plaintiff asserts, where an agency is aware a PLA requirement may increase price, FAR
requires the agency to analyze price before adding a PLA requirement.  Plaintiff contends the
sources sought survey put the government on notice a PLA requirement could exclude bidders
with a local workforce to ultimately increase the price of the contract.  *See* Tr. at 76:23–77:4
("[PLAINTIFF:] There just isn't enough union labor force in New Orleans.  But XXX has its
own nonunion labor force.  So it's reasonable, or at least the government should have evaluated,

whether XXX could offer $500 million, the top of the range, but XXXXXXXX and the 3 other out-of-town offerors would have to pay 15 percent more to get that union labor there"). Plaintiff argues, given the FAR exception to ensure adequate competition at a fair and reasonable price, this notice of potential price increases required USACE to look beyond the number of competitors and analyze price. *See* Pl.'s MJAR at 15 (citing FAR 22.504(d)(1)(ii)) ("The Agency focused on whether a sufficient number of offerors would bid on the Solicitation. The Agency did not, however, meaningfully analyze whether and to what extent the overall cost of this Procurement would be impacted by a PLA."); *see also* Tr. at 78:15–21 ("[PLAINTIFF:] And I don't think the administrative record addresses at all that kind of analysis as to whether any reduction in competition . . . would have a substantial enough impact on price that you could come to a determination that that adequate competition at a fair and reasonable price requirement was not met."). Additionally, Plaintiff argues USACE "fail[ed] to comply with OMB guidance that permits an exception to the PLA Requirements upon due consideration of the number of potential offerors . . . [and subject to] consideration of whether there will be a 10 percent or more price increase for the project." Pl.'s MJAR at 15–16.

The government argues under FAR at least two bidders suffices for adequate competition, so the sources sought survey confirming at least five bidders eliminated any need for a price analysis. *See* Gov't's Cross-MJAR at 40 ("Under the FAR, two bids is generally considered to be adequate competition to establish a fair and reasonable price. . . . USACE's market research amply demonstrates the reasonableness of its conclusion that it will have adequate competition to obtain a fair and reasonable price."). According to the government, while "adequate competition at a fair and reasonable price" mentions price, no analysis of price is needed *per se* where the FAR already clarifies adequate competition is established by at least two bidders. *See* Tr. at 85:9–23 ("THE COURT: Is there any situation where the Army Corps does need to analyze the price impact of a PLA requirement to avoid being an arbitrary and capricious agency action? [THE GOVERNMENT]: I think it needs to at least analyze the competition aspect and whether there will be adequate competition to establish a fair and reasonable price . . . THE COURT: So the answer is no, then? Is that . . . if the agency is simply analyzing competition and finding a number greater than one, then that also takes into account price impact sufficiently? [THE GOVERNMENT]: That that . . . complies with the FAR and the exception listed in 22.504(d)."). With regard to the OMB Memo, the government argues the memo permits, but does not require, an agency to conduct a price analysis if it wishes to except a solicitation from a PLA despite adequate competition at a fair and reasonable price. *See* Tr. at 80:19–81:1 ("[THE GOVERNMENT:] So the new OMB memorandum doesn't impose a mandatory requirement on the agency here to do anything, it . . . gives guidance to the agency . . . it can invoke exception, even if it does have two or more offerors"). Because market research showed five companies would bid with a PLA requirement, the government argues no additional price analysis was necessary to meet adequate competition under FAR and the OMB Memo. *See* Gov't's Reply at 15–16 ("Based on the market research responses, USACE has every reason to believe that it will receive sufficient bids with a PLA requirement to obtain a fair and reasonable price through competition.").

"To interpret a regulation we must look at its plain language and consider the terms in accordance with their common meaning." *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997) (citations omitted). On a plain reading, the exception to the PLA mandate for

adequate competition is discretionary under both FAR and the OMB Memo—neither *require* the agency to invoke the exception.  FAR 22.504(d)(1) prefaces all the listed exceptions with the language, "The senior procurement executive *may* grant an exception . . . ."  *See* FAR 22.504(d)(1) (emphasis added).  Referring to an exception for a PLA requirement resulting in a ten percent or more price increase, the OMB memo specifies "the agency *may* use this finding to support" an exception.  OMB Memo M-25-29 (emphasis added).  Though an agency's failure to invoke an exception may otherwise result in a violation of procurement law, the regulations themselves do not mandate use of an exception.  *See MVL I*, 174 Fed. Cl. at 469 ("When compared to the prior administration's discretionary policy, the PLA mandate's exceptions—*though theoretically discretionary*—are rendered functionally meaningless if the agencies take the uniform approach of never seeking an exception regardless of the strength of the market survey data recommending against the inclusion of a PLA.") (emphasis added).  Given the FAR and OMB Memo confer discretion to the agency when choosing to invoke an exception by using the word "may," neither impose a mandatory duty on the agency to invoke the exception.

Even if the FAR "adequate competition" exception were mandatory, the FAR proposes two factors for bypassing the exception and forgoing a pricing analysis beyond comparison of bids.[7]  First, according to the FAR, all that is necessary to ensure adequate competition at a fair and reasonable price is at least two bidders.  *See* FAR 15.403-1(c)(1)(i)(A) ("A price is based on adequate price competition when[ t]wo or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement.").  As the FAR explains, to determine whether a price is "fair and reasonable," "comparison of proposed prices received in response to the solicitation" is a form of price analysis, so "[n]ormally, adequate price competition establishes a fair and reasonable price."  *See* FAR 15.404-1(b)(2)(i) (citing FAR 15.403-1(c)(1)); *see also Lengerich v. Dep't of Interior*, 454 F.3d 1367, 1370 (Fed. Cir. 2006) ("In interpreting a regulatory provision, we examine the text of the regulation as a whole, reconciling the section in question with sections related to it." (citations omitted)).  In this way, receiving and comparing at least two bids suffices for a price analysis to ensure each individual bid received is fair and reasonable.  *See id.*  Second, similar to the discretionary nature of the competition exception, both FAR 22.504(d)(1) and the OMB Memo indicate a pricing analysis may be required if the agency wishes to *avoid* a PLA requirement, but not when the agency wishes to *impose* a PLA requirement.  *See* FAR 22.504(d)(1)(ii) ("A likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from coverage under this authority unless it is coupled with the finding that the reduction would not allow for

---

[7] The Court notes the FAR exception for adequate competition departs from the corresponding EO 14063 exception for full and open competition.  *Compare* EO 14063 § 5(b) (considering whether a requirement "would substantially reduce the number of potential bidders so as to frustrate full and open competition"), *with* FAR 22.504(d)(1)(ii) (considering whether a requirement "would substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved").  At oral argument, the government argued a PLA requirement was added to ensure the "best value" for the government.  *See* Tr. at 28:20–23 ("[THE GOVERNMENT:]  an offeror that doesn't provide a PLA is not providing the best value to the government").  The substantial departure of the FAR exception language (to ensure adequate competition) from the EO 14063 exception language (to ensure full and open competition) appears at odds with ensuring best value for the government, especially in light of the hypothetical discussed at oral argument.  *See* Section IV.A.2, *supra* (discussing a PLA requirement which excludes five bidders, each with $50 millon bids, but includes five more expensive bidders, with $100 million bids, and noting the government's position no pricing analysis beyond confirming the number of bidders would be required of the agency to avoid an exception under FAR 22.504(d)(1)(ii)).

adequate competition at a fair and reasonable price."); *see* OMB Memo M-25-29 at 2 ("If adequate price competition can be achieved, use of this exception would not be appropriate, even if the number of offerors who indicate they will not compete because of the PLA is significantly higher than the number of sources who have expressed an intent to compete.  If, based on market research for a given project, two or more offerors express interest (or three bids for sealed bidding) but prices are expected to be higher than the government's budget by more than 10 percent due to the PLA requirement, the agency may use this finding to support a determination that fair and reasonable pricing cannot be achieved.").  Thus, not only is the agency not required to exercise a PLA exception, but it also need not conduct a pricing analysis unless invoking a PLA exception.  *See id.*  Here, the government is declining to exercise an exception, and, even if a pricing analysis were required, two or more bidders suffices under FAR to establish adequate competition at a fair and reasonable price.  *See* FAR 15.403-1(c)(1)(i)(A) ("A price is based on adequate price competition when[ t]wo or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement").  The bar for USACE's compliance with FAR is low—FAR's PLA exceptions are discretionary, and the adequate competition exception does not require price analysis beyond confirming at least two bidders.[8]  Accordingly, the FAR does not require USACE to analyze price beyond counting the number of bidders.  FAR 15.403-1(c)(1)(i)(A).

### B.    Whether CICA Required a Pricing Analysis

In a section of its brief titled "The PLA Requirements violate CICA as applied," plaintiff argues "[t]he Agency's failure to meaningfully analyze . . . whether the requirement would increase costs was arbitrary and capricious and constitutes procurement error."  *See* Pl.'s MJAR at 24, 26.  Plaintiff does not identify the provision of CICA it argues the government violated, but states "[t]he Agency's deliberation process leading up to the decision to include the PLA Requirements in the Solicitation further emphasizes the arbitrary and capricious nature of the Agency's decision."  *Id.* at 25.  As "market research often showed that 'PLAs would reduce the number of interested contractors and possibly raise the price of the contract,'" plaintiff argues it was arbitrary and capricious for USACE to require a PLA without analyzing whether the requirement would increase costs.  *Id.* at 26 (quoting AR Tab 46 at 7745 (USACE E-mail Transmitting New PLA Rules and Guidance, dated December 26, 2023)).

The government argues all that was required to comply with CICA was USACE's determination the PLA requirement was reasonably necessary to meet USACE's needs.  *See* Gov't's Cross-MJAR at 3 ("USACE rationally determined to include a PLA requirement in the WSLP-114 solicitation, and, thus, the requirement does not unduly restrict competition in violation of CICA.").  Thus, the government argues the benefits of PLAs listed in EO 14063, paired with USACE's determination no PLA exceptions applied, suffice for compliance with

---

[8] This Court previously expressed skepticism of the agencies' proper use of PLA exceptions.  *MVL I*, 174 Fed. Cl. at 469 ("[T]he PLA mandate's exceptions—though theoretically discretionary—are rendered functionally meaningless if the agencies take the uniform approach of never seeking an exception.").  The Court's task, however, is to assess USACE's compliance with FAR, not to impose requirements beyond the plain language of the regulation and change the rules of the game.  *See DGR Assocs. v. United States* ("*DGR*"), 690 F.3d 1335, 1341 (Fed. Cir. 2012) ("And although the subsequent decisions from the GAO and the Court of Federal Claims took positions against the validity of the SBA's parity regulations, neither has the authority to invalidate properly promulgated regulations of an Executive Branch agency." (citations omitted)).

CICA—*i.e.*, there is no need for pricing analysis. *See* Tr. at 75:16–76:2 ("THE COURT: Yeah, but I mean, I understand it is the executive order in our situation for the Florida hypothetical prefers the five out-of-town companies charging twice as much, but does that not violate CICA? [THE GOVERNMENT]: No, . . . it wouldn't necessarily violate CICA. The agency may make a determination that . . . its needs are better served without a PLA requirement in that case, especially under the new Trump administration guidance, but that wouldn't be a violation of CICA to include this contract performance requirement based on the benefits that PLAs would provide.").

The question of whether CICA requires a pricing analysis relies on whether USACE complied with CICA by providing a rational basis to support the PLA requirement. Plaintiff argues, in the process of tailoring, USACE failed to conduct a pricing analysis, which is arbitrary and capricious and constitutes "procurement error"—this argument is predicated on USACE first being required to analyze and document its analysis for purposes of *NGS*'s tailoring requirements. This analysis, according to plaintiff, must include a pricing analysis. The Court determined USACE's addition of a PLA requirement was arbitrary and capricious for lack of a meaningful assessment as to its needs for a PLA in WSLP-114, *see* Section IV.A–B, *supra*. Given USACE failed *in toto* to conduct a meaningful assessment, plaintiff's argument that USACE failed to conduct a pricing analysis in a non-existent agency assessment is not ripe for the Court to review. Even if USACE hypothetically conducted a meaningful assessment in support of its PLA requirement, neither the FAR nor CICA explicitly require a pricing analysis. Instead, the FAR, CICA, and *NGS* advise "full and open competition . . . means that all responsible sources are permitted to [bid]," but does not mean all responsible sources are permitted to bid *unless excluding responsible sources would not impact price. See NGS*, 923 F.3d at 983 (quoting 41 U.S.C. § 107). USACE's hypothetical assessment could consist of *any* rational analysis to support its PLA requirement—but is not required to contain a pricing analysis per CICA or *NGS*, unless a pricing analysis became an "important aspect of the problem." *See Ala. Aircraft*, 586 F.3d at 1375.

## VI.    Whether the Court Should Permanently Enjoin a PLA Requirement for WSLP-114

In evaluating whether permanent injunctive relief is warranted, a court must consider: "(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987)). "[T]he [C]ourt must consider the [balance of] equities, including the balance of harms," when" determining "[w]hether declaratory or injunctive relief is the appropriate remedy." *Fisher Sand & Gravel Co. v. United States*, 143 Fed. Cl. 247, 254 n.8 (2019) (citing *PGBA, LLC*, 389 F.3d at 1228). No one factor is dispositive, and "the weakness of the showing of one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). If the Court awards injunctive relief, it may fashion its own remedy to fit the contours of the decision. *See Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011) (explaining "the Court of Federal Claims has broad equitable powers to fashion an appropriate remedy"). As plaintiff has succeeded on the merits of its

as-applied challenge to USACE's implementation of EO 14063 to add a PLA requirement to WSLP-114—satisfying Factor (1)—*see* Section IV, *supra*, the Court now considers the remaining three factors to determine whether enjoining the PLA requirement in WSLP-114 is appropriate.

### A.    Factor (2):  Irreparable Harm

Plaintiff argues a PLA requirement causes plaintiff to "be excluded from competition and [to] lose the opportunity to compete for and obtain profits from this contract."  *See* Pl.'s MJAR at 35.  The government only disputes irreparable harm to the plaintiff with regard to plaintiff's facial challenge.  *See* Gov't's Cross-MJAR at 45, 48 (opposing invalidation of EO 14063 for future procurements because plaintiff can file bid protests to dispute PLA requirements for future procurements); *see also* Gov't's Reply at 19 ("Filing individual bid protests is not irreparable harm.").  "The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract."  *Michael Stapleton Assocs., Ltd. v. United States*, 163 Fed. Cl. 297, 350 (2022) (quoting *CW Gov't Travel, Inc., v. United States*, 110 Fed. Cl. 462, 494 (2013) and citing seven other Court of Federal Claims cases); *see also Contracting, Consulting, Eng'g LLC v. United States*, 104 Fed. Cl. 334, 355 (2012) (noting "a lost opportunity fairly to compete" may constitute irreparable injury).  "The loss of the contract represents not only irreparable injury in terms of lost potential profit, but also in terms of lost experience and opportunity to work."  *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 292–93 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018) (citation omitted).  Given the Court's determination the PLA requirement unlawfully excludes plaintiff from competition for WSLP-114, and because the government does not dispute the specific exclusion from WSLP-114 (as opposed to future procurements) would cause irreparable harm, plaintiff has demonstrated "irreparable harm [by being] deprived of the opportunity to compete fairly for a contract."  *Michael Stapleton Assocs.*, 163 Fed. Cl. at 350 (quoting *CW Gov't Travel*, 110 Fed. Cl. at 494; *see also Palantir USG, Inc. v. United States*, 904 F.3d 980 (Fed. Cir. 2018) (affirming the lower court's injunction); *PGBA*, 389 F.3d at 1232 ("Such discretionary decisions are properly left to the trial court's sound judgment.").  Factor (2)—irreparable harm—weighs in favor of injunctive relief for plaintiff's as-applied challenge.  *Id.*

### B.    Factor (3):  The Balance of Harms

Plaintiff argues the balance of harms weighs in its favor because, absent an injunction, it is caused irreparable injury, whereas if an injunction is issued, the government would simply be required to comply with CICA.  *See* Pl.'s MJAR at 35 ("it is an obligation rather than a hardship for the Government to employ resources to comply with procurement law" (citations omitted)).  The government argues it would be harmed not only through amendment to the solicitation, but also through delay of the procurement and the risks to safety of Louisiana residents due to a delay in critical infrastructure for the hurricane season.  *See* Gov't's Cross-MJAR at 48–49.  Regarding delay, the government noted at oral argument, in the event of an injunction, "the agency would essentially . . . need to at least justify an exception to the PLA requirement under 22.504(d)[,] . . . amend the solicitation [to] remove the PLA requirement[,] and then give bidders a reasonable opportunity to submit bids . . . at least by 30 days or so."  *See* Tr. at 127:7–16.  The government notes WSLP-114 is meant to address a 1% annual risk of a 100-year flood event and

argues the procurement could delay construction of critical risk-mitigation infrastructure. *See* App'x at 1–4, Gov't's Cross-MJAR, ECF No. 18-1.

As discussed in Section VI.A, *supra*, absent an injunction, plaintiff will suffer immediate irreparable injury through deprivation of a fair opportunity to compete for award, as well as the attendant loss in potential profits, experience, and opportunity to work. The risk of harm to the government itself is relatively minimal—the government would simply be required to perform routine contract administration tasks and wait an additional 30 days to award the procurement. *See* Tr. at 127:7–16. Regarding risks of delay to WSLP-114, this Court has already addressed the government's concerns in moving extremely expeditiously to consider this bid protest on an expedited basis compared to the sixteen cases consolidated under *EVCON*. *See* Section I.E, *supra*. In its 27 August 2025 Order, this Court noted, "based on representations from counsel for the government and [USACE]," plaintiff's case "concerns an urgent procurement with a strict terminus of 15 December 2025." *See* 27 August 2025 Order Consolidating Cases at 2, *EVCON*, No. 25-1101. At oral argument, the government noted the drop-dead date for a decision from the Court is 16 December 2025. *See* Tr. at 129:4–10 ("[THE COURT: W]hat is your concern date and when does the government request, other than just generally, as quickly as possible, for a decision to be made? [THE GOVERNMENT: W]ith the bid opening set for December 17th, December 16th would be the day."); 131:8–11 ("[THE COURT:] The court appreciates the government's concern related to the timing and the need to move quickly with this procurement, so we will do everything possible to issue a decision on or before December 16th."). The Court set an expedited schedule in this case to address the very concerns raised by the government for timely completion of WSLP-114. *See* 27 August 2025 Order, ECF No. 12. Accordingly, enjoining a PLA requirement for WSLP-114 on this day, 16 December 2025, comports with the government's requested timeline. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citing *Amoco Prod.*, 480 U.S. at 546 n.12); *Turner Constr.*, 645 F.3d at 1388. Factor 3—balance of harms—weighs in favor of injunctive relief for plaintiff's as-applied challenge. *Id.*

## C.    Factor (4): The Public Interest

The final factor contemplates whether an injunction serves the public interest: when "employing the extraordinary remedy of injunction," a court "should pay particular regard for the public consequences" of doing so. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Plaintiff argues this factor weighs in its favor as "it is in the public interest to maintain a 'fair and competitive procurement process, which is best served by ensuring that the government complies with regulations governing procurement programs.'" Pl.'s MJAR at 35 (citing *KWV, Inc. v. United States*, 111 Fed. Cl. 119, 128 (citing *Wackenhut Servs. Inc. v. United States*, 85 Fed. Cl. 273, 312 (2008))). The government notes a PLA requirement would delay award and argues "any further delay in award would likely prevent construction from being sufficiently complete to provide any level of risk reduction during the 2029 hurricane season . . . [and] may deprive USACE and the residents of southeast Louisiana the benefits of the project during . . . the 2030 hurricane season." *See* App'x at 3–4, Gov't's Cross-MJAR.

"It is axiomatic that the public has an interest in honest, open, and fair competition in the procurement process." *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997) (citing

*Magellan Corp. v. United States*, 27 Fed. Cl. 446, 448 (1993)).  "It is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations."  *Labat-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 581 (2005) (internal citations and quotations omitted).  The Court therefore agrees with plaintiff it is in the public interest to maintain the integrity of the competitive procurement process.  *Id.*  The Court must now weigh the public interest in competitive procurements with the government's concern for timely completion of WSLP-114 to protect southeast Louisiana residents from a 100-year flood event.

As discussed in Section VI.B, *supra*, the government's concerns for delay to WSLP-114 have already been addressed in the Court's expedited schedule for this case.  In an appendix to the government's Cross-MJAR, a Branch Chief in Project Management for USACE's New Orleans District, Bradley Drouant, lays out the risks of delaying WSLP-114.  *See* App'x at 1–4, Gov't's Cross-MJAR.  Mr. Drouant states, "the flood control system is built to reduce the risk of a [100-year] flood . . . , but there's still a 1% chance it could happen each year."  *Id.* at 2.  According to Mr. Drouant, "USACE estimates [Minimally Defensible System Completion] can be completed . . . as early as 1,370 days after contract award."  *Id.* at 3.  Mr. Drouant continues, "USACE's experience . . . is that its construction contracts are often extended by at least 20 percent of the contract period due to weather and other factors[,] . . . [so] USACE estimates that it could have Minimally Defensible System Completion in July 2030."  *Id.* at 4.  To the extent the government argues 30 days is a significant delay to the procurement to the detriment of the public interest because it would "set the expected timeline back for the 2029 and 2030 hurricane season," the Court notes 30 days is a relatively brief period compared to the four-year timeline.  *See* Tr. at 129:2–3.  Given the government already accounts for a 20 percent average delay due to weather and other factors, an additional 2.2 percent delay is minimal, especially in light of the public "interest in honest, open, and fair competition in the procurement process."  *Cincom Sys.*, 37 Fed. Cl. at 269 (citing *Magellan Corp.*, 27 Fed. Cl. at 448).  Factor 4—the public interest—weighs in favor of injunctive relief for plaintiff's as-applied challenge.  *Id.*

## D.    Whether the Balance of Factors Warrants Equitable Relief

Related to its as-applied challenge, plaintiff requests the Court:  "[(1)] issue a declaratory judgement [sic] that the Agency's inclusion of the PLA Requirements in the Solicitation is a statutorily unauthorized restriction on competition in violation of CICA that is unlawful, arbitrary, capricious, or otherwise an abuse of discretion[; and (2)] issue a permanent injunction and order that the Agency remove and/or void the PLA Requirements from the Solicitation."  *See* Pl.'s MJAR at 39.  At oral argument, the government noted regarding injunctive relief, "if the court enjoins the bid opening on December 16th, then the agency won't go forward with the bid opening on the 17th.  Otherwise, the agency intends to move forward."  *See* Tr. at 129:12–15.  When asked what edits to USACE's procurement would be required if the Court enjoined the PLA requirement, the government indicated "the agency would essentially . . . justify an exception to the PLA requirement under 22.504(d)[,] amend the solicitation [to] remove the PLA requirement[,] and then give bidders a reasonable opportunity to submit bids that are based on the new requirement."  *See* Tr. at 127:7–12.  Accordingly, the Court grants an injunction requiring USACE to:  (1) justify an exception to the PLA requirement under FAR 22.504(d); (2) amend the solicitation to remove the PLA requirement; and (3) give bidders a reasonable

opportunity to submit bids based on the new requirement. *See id.*; *Turner Constr.*, 645 F.3d at 1388 ("[T]he Court of Federal Claims has broad equitable powers to fashion an appropriate remedy"). To the extent plaintiff requests declaratory judgment beyond a permanent injunction, the Court notes Section IV, *supra*, extensively details how a PLA requirement as applied to WSLP-114—and as reflected in the administrative record—was an arbitrary and capricious violation of CICA. *See generally* Section IV, *supra*.

## VII. Whether the Court Can Invalidate E.O. 14063 Based on Plaintiff's Facial Challenge to a PLA Requirement

Plaintiff asks the Court to invalidate EO 14063 for facially violating CICA and FPASA (and therefore Article II of the Constitution for exceeding the President's statutorily-defined authority). *See* Pl.'s MJAR at 2–3 ("Executive orders and FAR regulations that violate a statute are void and unenforceable. The judiciary's role is to interpret statutes independent of influence from executive branch political and policy preferences. The Court should discharge this duty by interpreting the plain language of CICA and FPASA.") (citations omitted); *see also* Pl.'s Resp. at 22 ("The Constitution does not authorize the PLA Requirements"). At oral argument, plaintiff confirmed its facial challenge is substantially the same as the challenge dismissed by this Court in the *MVL* decisions, but advocated the Court "change [its] mind." *See, e.g.*, Tr. at 111:2–5 ("[THE COURT:] [A]re you arguing anything different or am I going to say the same thing? [PLAINTIFF]: I mean, I would love for you to change your mind."). Accordingly, the Court reviews plaintiff's facial challenge to determine whether plaintiff has identified any controlling law conferring jurisdiction on this Court to do so.

### A. Whether Plaintiff's Facial Challenge Differs from those Raised in the *MVL* Litigation

In *MVL I*, plaintiffs argued EO 14063 identified FPASA as its statutory authority, but FPASA did not authorize the PLA mandate. *MVL I*, 174 Fed. Cl. at 459. After reviewing one Eleventh Circuit case cited by the plaintiffs, this Court rejected the plaintiffs' challenge, noting "the parties offer[ed] little by way of precedential authority on this issue" and seeing fit to "leave[] to Congress the matter of addressing the President's authority under FPASA to issue expansive construction industry labor policies." *Id.* at 460 (citing 41 U.S.C. § 3306). Here, plaintiff also challenges EO 14063 as lacking statutory support from FPASA, and plaintiff concedes its arguments are substantially the same as in *MVL I*. *See* Tr. at 111:6–8 ("THE COURT: You're arguing the same thing and I am probably going to say the same thing, right? [PLAINTIFF]: That would not surprise me."). Plaintiff raises a slight nuance not considered in *MVL I*, arguing the text of FPASA requires consistency with CICA; so to the extent EO 14063 violates CICA on its face, EO 14063 would also violate FPASA on its face. *See* Tr. at 111:10–15 ("[PLAINTIFF]: I do think it's worth considering, though, on the issue of FPASA, whether or not the CICA being part of the subtitle leads to a similar result, meaning that FPASA, at least the way the executive order and the FAR rule are structured, are not consistent with FPASA, as opposed to there's no authority from FPASA."). As plaintiff conceded at oral argument, however, this nuance simply amounts to a facial challenge to the EO on the basis of CICA. *See* Tr. at 111:16–112:10 ("THE COURT: Okay, but then the only analysis that needs to be done is the CICA analysis. [PLAINTIFF]: Correct. THE COURT: So then I don't even

need to say what I said in January? [PLAINTIFF]: I would just say the same thing and find that it's not supported. The executive order and the FAR rule are not supported. THE COURT: But CICA is violated? [PLAINTIFF]: Correct. And if you're using FPASA as the authority, you can't violate CICA, because CICA is part of the subtitle. THE COURT: Well, but the argument there is just that an executive order cannot violate law. [PLAINTIFF]: Yes. THE COURT: Hopefully we all agree with that. [PLAINTIFF]: I think so. THE COURT: [Government], can an executive order violate law? [THE GOVERNMENT]: No."). Accordingly, seeing no controlling legal precedent to invalidate the executive order as violative of FPASA, the Court "leaves to Congress the matter of addressing the President's authority under FPASA to issue expansive construction industry labor policies," as it did in *MVL I*. 174 Fed. Cl. at 460 (citing 41 U.S.C. § 3306).

Regarding CICA and the Constitution, plaintiff also concedes its facial challenge to EO 14063 is the same raised by plaintiffs in *MVL I* and *MVL II*. *See* Tr. at 113:6–10 ("THE COURT: Related to CICA, the argument is that the executive order facially violates CICA, which is how the court analyzed the contracts back in January and it's the same argument that you're making now? [PLAINTIFF]: Yes, Your Honor."); *see also* Tr. at 112:21–113:5 ("THE COURT: . . . moving on to Constitution Article 2. So, [plaintiff], you argue that the executive order is the executive branch unconstitutionally commandeering legislative authority, that's the same argument that was addressed in *MVL I*? [PLAINTIFF]: Yes, we don't have any different position on that."). In the *MVL I* decision, in the context of facial invalidation of the EO as violative of CICA, this Court addressed the plaintiffs' arguments when fashioning injunctive relief and declined to enjoin PLA requirements for all future procurements. *See MVL I*, 174 Fed. Cl. at 473–74. Instead, this Court limited relief to the plaintiffs' as-applied challenge, stating, "the circumstances surrounding the individual solicitations and the varying needs of three different agencies (USACE, NAVFAC, and GSA) warrants the agencies be afforded a short period of time to reassess their PLA decision on an individual basis." *Id.* at 474 (citation omitted). In *MVL II*, this Court found it entirely lacked jurisdiction to invalidate an executive order facially violative of CICA. *See MVL II*, 176 Fed. Cl. at 616 ("Further, *Boeing* must be read with *DGR*, where the Federal Circuit plainly instructed the Court of Federal Claims lacks 'the authority to invalidate properly promulgated regulations of an Executive Branch agency' in a bid protest." (citing *DGR*, 690 F.3d at 1341)); *see also* Section VII.B, *infra*. Accordingly, as in *MVL I*, the Court limits relief to USACE's as-applied violation of CICA discussed in Section IV, *supra*. *See MVL I*, 174 Fed. Cl. at 474 (cleaned up) (citations omitted); *see also Turner Constr.*, 645 F.3d at 1388 ("[T]he Court of Federal Claims has broad equitable powers to fashion an appropriate remedy.").

### B.    Whether B&G's Jurisdictional Argument Differs from *MVL II*

As in *MVL II*, plaintiff also argues this Court has jurisdiction to both declare EO 14063 facially invalid and permanently enjoin the PLA mandate. *See* Pl.'s MJAR at 33 ("The Court has jurisdiction to render permanent injunctive relief to remedy the Agency's violation of CICA in connection with this Solicitation." (emphasis and citations omitted)); *see also* Tr. at 125:8–13 ("[PLAINTIFF:] [T]he Tucker Act is expansive in its relief and [plaintiff] believe[s] the Administrative Procedures Act could be read particularly when you look at (b)(4), to include the authority to issue a declaratory judgment, essentially, without an injunction."). Given the

Court's finding the legal basis for plaintiff's facial challenge is the same as that in the *MVL* litigation, *see* Section VII.A, *supra*, the Court now determines whether plaintiff's argument the Court has jurisdiction to facially invalidate EO 14063 differs from the plaintiffs' argument in *MVL II*.

In *MVL II*, this Court determined it lacks jurisdiction to facially invalidate EO 14063 and its related FAR regulations:

> Without tethering their requested relief to interested parties and specific procurements, plaintiffs cannot chin the statutory bar by relying only on *future* harm in *future* protests. *See* 28 U.S.C. § 1491(b)(1). Further, *Boeing* must be read with *DGR*, where the Federal Circuit plainly instructed the Court of Federal Claims lacks "the authority to invalidate properly promulgated regulations of an Executive Branch agency" in a bid protest. *See DGR*, 690 F.3d at 1341. Although the language in *Boeing* was less clear than the Federal Circuit's instruction in *DGR*, both cases must be read within the Tucker Act's express limitation of this Court's jurisdiction to challenges of "alleged violation of . . . [a] regulation *in connection with a procurement or a proposed procurement*" brought by "*interested* part[ies]." 28 U.S.C. § 1491(b)(1) (emphasis added).

*MVL II*, 176 Fed. Cl. at 616. At oral argument, plaintiff agreed its facial challenge is the same as the challenge raised in *MVL II*. *See* Tr. at 113:11–15 ("THE COURT: Related to my jurisdiction to rescind the executive order. So there, you request, I think, the same request that you did in *MVL 2*. Is that correct? [PLAINTIFF]: Yes, Your Honor."). Plaintiff also agreed the law has not changed since the *MVL II* decision.[9] *See* Tr. at 114:10–22 ("THE COURT: Well, is there any update in law since the May decision? [PLAINTIFF]: We have not seen -- we have read, as Your Honor requested, the briefing in the 11th Circuit on the issue of jurisdiction in the Court of Federal Claims and/or versus the U.S. District Court. We were kind of hoping that the 11th Circuit would have issued a decision before today's argument, but to our knowledge, as of yesterday, they had not. [THE COURT:] Other than that case potentially coming out, no law has changed? [PLAINTIFF]: I am not aware and we have done a search, we have not seen any cases."). Accordingly, seeing no controlling precedent to change the decision reached in *MVL II*, the Court again concludes it lacks jurisdiction to invalidate EO 14063. *See MVL II*, 176 Fed. Cl. 619 ("Given plaintiffs can pursue their requested relief in district courts and *Boeing* is best read within the statutory parameters laid out by Congress in the Tucker Act, the Court declines to change the rules of the game by taking the sweeping action plaintiffs' request." (citations omitted)). Thus, to the extent the relief granted for plaintiff's as-applied challenge does not already render a request for declaratory judgment and permanent injunction pursuant to a facial challenge moot, the Court concludes it lacks jurisdiction to invalidate EO 14063 and therefore

---

[9] Plaintiff asks the Court to consider *Acetris Health, LLC v. United States*, 949 F.3d 719 (Fed. Cir. 2020) ("*Acetris*"), which the plaintiffs in *MVL II* did not raise. In *Acetris*, the Federal Circuit enjoined a contract requirement for a specific proposed procurement—not for all future procurements generally. *See Acetris*, 949 F.3d at 728. *Acetris* allows the injunction of a contract requirement for a specific plaintiff, a specific agency action, and a specific proposed procurement, *see id.*, not the broad injunction as to all future procurements plaintiff asks for here, *see* Pl.'s MJAR at 34 ("Injunctive relief is warranted here . . . with respect to the Government's ongoing violation of CICA through use of the PLA Requirements in all large-scale construction procurements." (emphasis omitted)).

lacks jurisdiction to issue a permanent injunction invalidating EO 14063 and a declaratory judgment declaring EO 14063 invalid.

**VIII.  Conclusion**

For the foregoing reasons, the Court **GRANTS IN PART and DENIES IN PART** plaintiff's Motion for Judgment on the Administrative Record, ECF No. 16.  The Court **ENJOINS** USACE from requiring a PLA in solicitation WSLP-114, and USACE **SHALL**:  (1) justify an exception to the PLA requirement under FAR 22.504(d); (2) amend WSLP-114 to remove the PLA requirement; and (3) give bidders a reasonable opportunity to submit bids based on the new requirement.  The Court **GRANTS IN PART and DENIES IN PART** the government's Cross-Motion for Judgment on the Administrative Record, ECF No. 18.  The Court **DENIES** plaintiff's requested relief regarding facial invalidation of EO 14063.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge